**CORTEZ III SERVICE CORPORATION,**
Plaintiff,

v.

**NATIONAL AERONAUTICS & SPACE
ADMINISTRATION, et al.,**
Defendants.

Civil Action No. 96–01301 (SS).

United States District Court,
District of Columbia.

Nov. 27, 1996.

Stuart Henry Newberger, Crowell & Moring, Washington, DC, for Plaintiff.

Daniel Franklin Van Horn and Darya Geetter, U.S. Attorney's Office, Washington, DC, for Federal Defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on plaintiff's Motion for Preliminary Injunction, defendants' response thereto, defendants' Motion to Dismiss, and plaintiff's response thereto.

## I. *Background*

Plaintiff is a New Mexico-based corporation. In 1986, it was awarded a contract by the NASA Lewis Research Center ("LeRC") pursuant to a set aside under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (1994) ("8a"). The contract was known as the Consolidated Logistics and Administrative Support Services ("CLASS") Contract. The terms of CLASS required plaintiff to provide LeRC with a broad range of services, from transportation to property disposal to video production.

In 1990, the CLASS contract expired. The new contract, CLASS–II, was offered under "full-and-open" bidding. In other words, contractors of any size, or social or economic background, could compete for the contract. Plaintiff was successful in its bid and has been operating under that contract ever since.

CLASS–II was set to expire on September 30, 1996.[1] In 1995, NASA started the process of setting up a follow-on procurement. That procurement was to include all of the services currently provided under CLASS–II, as well as additional services currently provided under smaller 8(a) contracts. The new contract is known as the Management and Operations Contract I ("MOC I"). Although the new contract would be larger than CLASS–II, which had been the subject of full-and-open competition, NASA decided that the new contract should be offered as a small business set-aside. Initially, NASA sought to administer MOC I as an internal set-aside. However, on the advice of counsel who were apparently worried about the implications of the Supreme Court's decision in *Adarand Constructors, Inc. v. Pena*, —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), NASA asked the SBA to take over awarding the contract so it could offer it pursuant to 8(a).

The 8(a) program is a business development program for small businesses owned by

---

1. In light of this litigation, the parties have agreed to extend the contract until December 2, 1996.

individuals who are both economically and socially disadvantaged. Small businesses owned and controlled by such individuals may apply to the SBA and, if certified by the SBA into the program, receive technological, financial, and practical assistance, as well as support through preferential awards of government contracts. The program allows the SBA to enter into contracts with other government agencies and then subcontract with qualified 8(a) participants.

In order for a firm to participate in the 8(a) program, the SBA must certify that it is a "small business." A business qualifies as "small" if it is independently owned and operated, is not dominant in its field of operation, and has the number of employees or annual gross receipts not in excess of the level set by regulation for the industry in which the business operates. 15 U.S.C. §§ 632(a)(1)–(3). A small business is "disadvantaged" if at least 51% of the firm is unconditionally owned and controlled by an individual who is both socially and economically disadvantaged. 15 U.S.C. § 637(a)(4)(A)–(B). "Socially disadvantaged" individuals are those who have been "subjected to racial and ethnic prejudice or cultural bias because of their identities as members of groups without regard to their individual qualities." 15 U.S.C. § 637(a)(5); 13 C.F.R. § 124.105. "Economically disadvantaged" individuals are those socially disadvantaged individuals "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A).

Individuals who are members of certain racial groups are presumptively socially disadvantaged. 13 C.F.R. § 124.105. However, social disadvantage may be demonstrated by any individual who presents evidence to the SBA that he or she has personally suffered social disadvantage as a result of "color, ethnic origin, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar cause not common to small business persons who are not socially disadvantaged." 13 C.F.R. § 124.105(c)(1)(i). If this back-

ground has adversely affected the individual's status in business, the individual qualifies as socially disadvantaged. 13 C.F.R. § 124.105(c)(v).

All prospective program participants must show that they are economically disadvantaged. An economically disadvantaged individual may not have a net worth exceeding $250,000 upon entering the program. 13 C.F.R. § 124.106(a)(2)(i). Additionally, the SBA examines the individual's income for the last two years, as well as the firm's assets, revenues, capital, net worth, and access to financing, supplier credit, and bonding capability. 13 C.F.R. §§ 124.106(a)(2)(ii)–(iii). The SBA uses the information to compare the firm to other entities in the same line of business who are not socially disadvantaged. 13 C.F.R. § 124.106(a)(1)(i).

An individual or firm can participate in the 8(a) program only once. After exiting the 8(a) program for any reason, a firm is no longer eligible to reapply. 13 C.F.R. § 124.108(c). Once a firm exits the program, an individual who has been counted toward the ownership requirement for that firm can never again be counted toward the 51% ownership requirement for another firm. *Id.*

In 1986, plaintiff qualified under 8(a): it was a small socially- and economically-disadvantaged business, at least 51% owned by an African–American, and had never participated in the program before. Plaintiff admits that it no longer qualifies for participation in the 8(a) program because it is now a large, non-minority-owned business and has completed the maximum term allowable under 8(a). But plaintiff claims that MOC–I should—like CLASS–II—be offered to full-and-open competition, rather than restricted to 8(a)-qualified firms. Plaintiff claims that by making MOC–I an 8(a) contract, defendants have violated plaintiff's equal protection rights by initiating a race-based program that is not narrowly tailored to a compelling government interest. Plaintiff also claims that defendants have violated the Administrative Procedure Act by offering a contract under 8(a) that will eventually

exceed the dollar-limit for such contracts.[2]

## II. *Standing*

 As a preliminary matter, the Court must evaluate defendants' claim that plaintiff does not have standing to bring this action. To have standing, plaintiff must satisfy a three-prong test. First, plaintiff must allege that it has suffered some actual or threatened injury; second, the injury must be fairly traceable to the challenged official conduct; and third, there must be a substantial likelihood that the alleged injuries will be redressed by a judicial decision in the plaintiff's favor. *Jacobs v. Barr,* 959 F.2d 313, 315 (D.C.Cir.1992).

The parties agree that *if* MOC–I is offered as an 8(a) contract, plaintiff is not eligible to compete. The reason for this is threefold: first, plaintiff is no longer a "small business," under the SBA; second, plaintiff is no longer a socially or economically disadvantaged business; and third, the plaintiff has "graduated" from the 8(a) program by participating for the maximum time allowed. But plaintiff would be eligible to compete for MOC–I if defendant NASA offered it as to "full-and-open" competition, as it did with CLASS–II.

Plaintiff claims that by not making MOC–I "full and open," the defendants have violated its rights under the constitution and the APA. The Court concludes that plaintiff has standing to make that claim. Under the standing analysis: (1) plaintiff faces the threatened injury of losing the right to compete for a valuable contract; (2) that injury is fairly traceable to the decision by NASA and SBA to offer the contract under 8(a); and (3)

if the Court finds that defendants violated either the APA or the Constitution, such a decision would put plaintiff in a position to compete for the contract, which it is now precluded from doing.[3]

## III. *Equal Protection Claim*

In order to succeed on its motion for preliminary injunction, plaintiff must demonstrate that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury in the absence of injunctive relief; (3) neither the defendants nor any other interested party will be harmed by the issuance of an injunction; and (4) an injunction will serve the public interest. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977).

### A. *Reasonable Likelihood of Success on Merits*

Plaintiff claims that based on the evidence before the Court at this time, there is a substantial likelihood that at a trial in this matter it could prove that defendants' offering of MOC–I under 8(a) is unconstitutional in light of *Adarand. Adarand* involved the Surface Transportation and Uniform Relocation Assistance Act of 1987, which parallels section 8(a) in much of its language. It requires, *inter alia,* prime contractors in government highway projects to subcontract a percentage of any project to disadvantaged business subcontractors. Like 8(a), minority status creates a rebuttable presumption of disadvantage. The plaintiff in *Adarand* challenged the constitutionality of the set-aside

---

2. To be eligible for 8(a), a company must have annual sales of $20 million or less. NASA has estimated that MOC–I will be worth $24 million a year. Plaintiff claims that if MOC–I meets expectations, after one year, the company awarded the contract will no longer be eligible under 8(a) and will have to give up the contract. For this reason, plaintiff claims that NASA and the SBA should not be able to offer the contract under 8(a) in the first place.

3. Defendants cite the post-*Adarand* case *Ellsworth Associates v. United States,* 926 F.Supp. 207 (D.D.C.1996) for the proposition that a contractor who has graduated from the 8(a) program does not have standing to challenge the constitutionality of 8(a). The rationale behind that decision was that even if the race-related portions of 8(a) are unconstitutional under *Ada-*

*rand,* there was a race-neutral reason (plaintiffs had contracted under 8(a) for the maximum time allowable) for excluding plaintiffs from competing for the contract. Accordingly, the Court held that even if it found the race-conscious portions of 8(a) to be unconstitutional, it would simply sever those portions of the statute and the plaintiffs would still be ineligible to compete.

While the same could be said for this case, this Court nonetheless concludes that this plaintiff has standing. The defendants in this case had broad discretion in deciding whether to offer MOC–I under 8(a). If plaintiff can show what it alleges, namely that the defendants used racial considerations in exercising that discretion, then that decision must be examined in light of *Adarand.*

program. The lower courts analyzed the program using an "intermediate scrutiny" analysis. *Id.* at ——, 115 S.Ct. at 2104. The Supreme Court reversed. Justice O'Connor held, with three Justices concurring and Justice Scalia concurring in part and concurring in the judgment, that

> all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests.

*Adarand,* —— U.S. at ——, 115 S.Ct. at 2113. The case was remanded back to the lower court so it could determine whether the program satisfied strict scrutiny.

■ The Supreme Court's decision in *Adarand* overturned *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) by holding Congress to the same level of scrutiny as state and local governments. But it did not overturn Justice O'Connor's plurality opinion in *City of Richmond v. J.A. Croson Company,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), which held that

> Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.

*Id.* at 490, 109 S.Ct. at 720. Reading *Adarand* and *Croson* together, it is clear that race-conscious actions by Congress must meet a strict scrutiny standard, but in determining whether they do so, Courts should give Congress somewhat greater deference.

Defendants claim that *Adarand* does not render the 8(a) program unconstitutional, either on its face or as applied here. Plaintiff does not challenge the facial constitutionality of Section 8(a), but claims that it has been unconstitutionally applied in the case of MOC–I.

■ The Court agrees with the parties that facially, 8(a) meets constitutional muster. Congress first implemented the Small Business Act to combat serious unlawful discrimination in government contracting. In oversight and reauthorization hearings held since implementation of the act, Congress has continued to find such discrimination. Without question, there is a compelling governmental interest in combating such discrimination where it exists. In the case of 8(a), the legislation and related regulations are narrowly tailored to the extent that they limit set asides to a minimum of five percent of government contracts and create only a rebuttable presumption that minority contractors are eligible for the program. Furthermore, where necessary, Congress has amended the statute so that it may fulfill its purpose as swiftly and as fairly as possible.

■ The fact that Section 8(a) is constitutional on its face, however, does not give the SBA, NASA or any other government agency carte blanche to apply it without reference to the limits of strict scrutiny. Rather, agencies have a responsibility to decide if there has been a history of discrimination in the particular industry at issue. Defendants state that

> imposing a requirement that Congress make specific, localized findings of discrimination to support race-conscious remedial legislation, when applied to the thousands of federal procurements awarded each year, would obviously frustrate Congress's broad power to remedy discrimination in contracting and fly in the face of the Supreme Court's admonition that strict judicial scrutiny not be strict in theory but fatal in fact.

Defendants' Motion to Dismiss at 15. However, it is not inconsistent with Congress's mandate to the SBA, to require the SBA to ensure that in each context where an 8(a) set-aside is proposed, such a set-aside is actually required.

Despite defendants claim that the 8(a) set aside is not affected by *Adarand,* the Court notes that the same Department of Justice that represents defendants has published memoranda and promulgated proposed regu-

lations to aid agency counsel in determining the legality of set-aside plans. *See* Proposed Reforms to Affirmative Action in Federal Procurement, 61 Fed.Reg. 26042 (1996); Walter Dellinger, Office of Legal Counsel, U.S. Department of Justice, *Memorandum to General Counsels* (June 28, 1995) (hereinafter "DOJ Memorandum"). These documents propose lengthy analyses that agencies should engage in before offering set-aside contracts. For example, in an appendix to the memorandum, are listed some of the questions that agencies should consider in determining whether a program satisfies *Adarand.*

> If the program is intended to serve remedial objectives, what is the underlying factual predicate of discrimination? Is the program justified solely by reference to general societal discrimination, general assertions of discrimination in a particular sector or industry, or a statistical underrepresentation of minorities in a sector or industry? *Without more, these are impermissible bases for affirmative action.* If the discrimination to be remedied is more particularized, then the program may satisfy *Adarand.* In assessing the nature of the factual predicate of discrimination, the following factors should be taken into account . . .
>
> . . . What is the nature of the evidence [of discrimination]? Is it statistical or documentary? Are the statistics based on minority underrepresentation in a particular sector or industry compared to the general minority population? Or are the statistics more sophisticated and focused? For example, do they attempt to identify the number of qualified minorities in the sector or industry or seek to explain what that number would look like "but for" the exclusionary effects of discrimination? . . . In addition . . . is there testimonial or anecdotal evidence of discrimination in the record underlying the program—for example, accounts of the experiences of minorities and nonminorities in a particular field or industry?

DOJ Memorandum at 35–36 (emphasis added).[4]

This is just a small sample of the analysis that the memorandum suggests agencies complete in light of *Adarand.* The Court agrees that such analysis is required to ensure that a particular program is narrowly tailored to a compelling government interest. Based on the record before it, the Court sees no evidence that NASA or the SBA did anything approaching such an analysis before making MOC–I an 8(a) program. Rather, the defendants simply rely on the facial constitutionality of Section 8(a) as a basis for broad application of 8(a) set-asides.

In reaching this conclusion, the Court is mindful of the history of this contract. In 1990, the CLASS–II contract was considered too large for a small business program and thus was made available for full-and-open competition. At the same time, smaller contracts at the NASA facility were made available to disadvantaged businesses under 8(a). Under MOC–I, the CLASS–II contract and those smaller contracts are being combined to make an *even larger* contract. Nevertheless, unlike in 1990, NASA and the SBA propose to offer the contract under Section 8(a). This decision-making process—while not in anyway dispositive—has at least to be explained to show the decision was not tainted.

NASA's first attempt to offer MOC–I as a set-aside was rejected by its own lawyers as a possible violation of *Adarand.* Having been so rejected, NASA turned to the SBA to enable it to invoke 8(a) and provide a northwest passage around *Adarand.*

■ Based on the record before it, the Court finds that the process used by defendants in deciding to offer MOC–I under 8(a) does not satisfy *Adarand*'s requirements of strict scrutiny. The defendants have at no

---

4. In addressing the "burden" element of the "narrowly-tailored" analysis, the memorandum asks

> Does the program displace those persons from existing . . . contracts? Does it upset any settled expectations that they have? Even if that is not the case, the burden may be impermissible where the exclusionary impact is too great. What is the exclusionary impact in terms of size and dimension? What is the dollar value of the contracts . . . in question?

DOJ Memorandum at 38.

time related why they believe it is necessary to pursue the 8(a) route. If NASA wants to proceed in this fashion, it has an obligation to explain what past societal disadvantages it intends to correct. If NASA believes it was proceeding correctly, it could have used its own contracting authority rather than referring the matter to the SBA. The record is silent on all these issues. The agency has the responsibility to explain its actions because of the indirect route it has taken in this procurement process. Accordingly, the Court finds that plaintiff has a reasonable likelihood of success on the merits of its equal protection claim.

### B. *Irreparable injury*

█ The second-prong of the preliminary injunction test requires a finding that plaintiff will suffer irreparable injury in the absence of injunctive relief. As the incumbent contractor, plaintiff corporation employs more than 500 individuals at LeRC. Furthermore, the CLASS–II contract represents 35 percent of the corporations total business. Without question, the inability to bid for the follow-on contract would be harmful to plaintiff.[5] Plaintiff has made a satisfactory showing of irreparable injury.

### C. *Harm to defendants or other interested parties*

█ Plaintiff must establish that a preliminary injunction will harm neither the defendants nor any other interested party. This decision will not harm the defendants because the work at LeRC will continue to be performed by the plaintiff who is the incumbent contractor. With respect to interested parties, it is assumed that bidding will be open to all such persons. What is more, nothing prevents the government from invoking 8(a) as long as it complies with equal protection requirements.

### D. *Public Interest*

This Circuit has held that in a case such as this, the "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws free of unconstitutional racial classifications." *O'Donnell,* 963 F.2d at 429. Without question, the public has an interest in ensuring that defendants do not implement a set-aside plan in violation of the Constitution.

### IV. *Conclusion*

The Court finds that plaintiff has standing to bring this action. Furthermore, the Court finds that on plaintiff's equal protection claim, a preliminary injunction should issue.

---

5. Of course, plaintiff could lose the contract even if allowed to compete for MOC–I. However, without an injunction, the set-aside process will go forward and plaintiff will be excluded from competing for MOC–I. This is enough to show irreparable injury. This Circuit has stated that a party challenging a set-aside provision "is much like an unsuccessful bidder for a government contract who is seeking judicial review because

the contract was awarded to another under illegal procedures.... [C]ourts do not determine who should have obtained the disputed contract. Rather, agencies are routinely enjoined to redo the bidding process, in order to vindicate the disappointed bidder's right to a legally valid procurement process." *O'Donnell Const. Co. v. District of Columbia,* 963 F.2d 420, 428–29 (D.C.Cir. 1992).