**ROTHE DEVELOPMENT CORPORATION,**
Plaintiff,

v.

**THE UNITED STATES DEPARTMENT OF DEFENSE, and the United States Department of the Air Force, Defendants.**

**Civil Action No. SA–98–CA–1011–EP.**

United States District Court,
W.D. Texas,
San Antonio Division.

April 27, 1999.

938

David Franklin Barton, The Gardner Law Firm, San Antonio, for Rothe Development Corporation.

Britannia Hobbs. Hardee, United States Attorney, San Antonio, Richard S. Ugelow, Employment Litigation Section Civil Right Division, U.S. Department of Justice, Washington, DC, Janie Allison Sitton, Stephen J. Curran, for United States Department of Defense, the United States Department of the Air Force.

Terry Dean Kernell, Mayer, Brown & Platt, Houston, Scott T. Nonaka, Mayer, Brown & Platt, New York, NY, for Asian American Legal Defense and Education Fund, National Asian Pacific American Legal Consortium, Asian Law Caucus, Inc., Asian Pacific American Legal Center.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PRADO, District Judge.

On this date the Court considered cross motions for summary judgment in the above-styled and numbered cause, filed on February 26, 1999. In addition, the Court considered the brief and accompanying materials filed by amici curiae, Plaintiff's motion to strike portions of Defendants' summary judgment evidence, and Plaintiff's motion to strike Defendants' letter brief. After careful consideration, the Court will grant Defendants' motion for summary judgment, deny Plaintiff's motion for summary judgment, deny Plaintiff's motion to strike Defendants' summary judgment evidence, including the Department of Commerce's Benchmark

Study, and grant Plaintiff's motion to strike Defendants' letter brief.

## INTRODUCTION

Plaintiff, San Antonio-based Rothe Development Corporation, was denied a contract with the United States Department of Defense (DoD) to operate and maintain the Network Control Center and the Switchboard Operations functions at Columbus Air Force Base in Mississippi. The parties agree that Rothe lost the bid for the contract solely as a result of the application of an evaluation preference designed to favor "socially and economically disadvantaged persons." Rothe was the low bidder, but, pursuant to the statutory preference, the DoD increased all bids submitted by non-qualifying companies by ten percent. As a result of that action, the contract went to International Computer and Telecommunications, Inc. (ICT), a business owned by Korean–American David Sohn.

Rothe sued the Government in this Court, requesting that a temporary restraining order be issued to stay the contract until the matter could be resolved. Upon agreement from the parties that the case could be tried on motions, before the expiration of the current contract, the Court denied the request for a restraining order.

In its motion, Rothe complains that the application of the preference violated its right to equal protection under the Fifth Amendment to the United States Constitution. The Government responds that the preference satisfies the strict scrutiny standard established by the United States Supreme Court in *Adarand v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)—that the preference is narrowly tailored to satisfy a compelling government interest.

## THE STATUTORY SCHEME AT ISSUE

Section 1207 of the National Defense Authorization Act of 1987 (the 1207 program) sets a statutory "goal" of five-percent participation by economically and socially disadvantaged businesses in DoD contracts. *See* 10 U.S.C. § 2323. The 1207 program points to section 8(d) of the Small Business Act in order to define economically and social disadvantaged businesses. *See* 10 U.S.C. § 2323(a)(1)(A); 15 U.S.C. § 637(d). That provision states that a business is "small" if it is independently owned and operated and is not dominant in its field of operation, and if its number of employees or annual gross receipts falls below a predetermined level. 15 U.S.C. § 632(a)(1)-(3). The business is deemed to be owned and controlled by a socially and economically disadvantaged person if such person owns at least fifty-one percent of the business and controls the business's management and daily operation. 15 U.S.C. § 637(d)(3)(C)(i)(ii). To qualify, an individual must have a net personal worth of under $750,000, excluding the value of his or her business and personal residence. 13 C.F.R. § 124.106(b)(2) (1998).

Under the Small Business Act, certain groups, including Black Americans, Hispanic Americans, Asian Pacific Americans, and other minorities, are presumed to be both economically and socially disadvantaged. *See* 15 U.S.C. § 637(d)(3)(C).[1] That presumption may be rebutted by a contracting officer, a failed bidder, or the Small Business Administration (SBA). 48 C.F.R. § 219.302–70 (1997). Presumptively disadvantaged individuals are still required to meet the personal worth requirement.

In addition, other individuals, not members of the groups given the statutory presumption, may offer proof that they

1. Following the practice of the parties, the Court's citations to regulations related to the 1207 program are, unless otherwise noted, to regulations as they existed and were codified at the time the contract at issue was solicited. Many of the relevant regulations have been modified or recodified since that time.

have been socially disadvantaged because of their color, ethnicity, gender, physical handicap, or "residence in an environment isolated from the mainstream of American society." 13 C.F.R. § 124.105(c)(1)(i) (1998). If such an individual can demonstrate that this disadvantage has adversely affected his or her status in the business community, he or she is considered to be economically and socially disadvantaged.

The 1207 program authorizes the DoD to apply a price-evaluation adjustment of ten percent in order to attain the five-percent contracting goal. 48 C.F.R. subpart 219.10 (1997); *id.* §§ 252.219–7000 & –7006. Under that provision, the DoD may raise the bids of non-SDBs by ten percent in order to give bidding SDBs a preference. Bidding SDBs may waive the evaluation preference. 48 C.F .R. § 219.7002(a).

## EQUAL PROTECTION AND AFFIRMATIVE ACTION

 The Constitution guarantees that the government will treat similarly situated individuals similarly. *See* U.S. CONST. amends. v. and XIV; *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). While this protection applies, with varying degrees of severity, to government classifications of all kinds, when a government seeks to treat similarly situated individuals differently from one another on the basis of their race or ethnicity, the government's action is reviewed with the most stringent judicial scrutiny.[2] *See Craig v. Boren,* 429 U.S. 190, 213 n. 1, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (Stevens, J., concurring); *Loving v. Virginia,* 388 U.S. 1, 7, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida,* 379 U.S. 184, 192–93, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed.

194 (1944); *United States v. Carolene Prods.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). Under this level of review, a governmental classification is unconstitutional unless it is narrowly tailored to a compelling interest.

Applying this standard, courts helped ensure that governments did not unconstitutionally discriminate against disadvantaged or oppressed minorities in this country. Confronted with invidious discrimination against traditionally oppressed minorities, courts demanded that governments justify all race-based classifications in order to ensure equal treatment. However, in the latter half of the twentieth century, as state and federal governmental agencies attempted to respond to the overwhelming effects of over a century of racial oppression and discrimination by enacting remedial, race-based programs, efforts to ensure such treatment became more complicated. While it seemed obvious that a government action attempting to oppress a disadvantaged minority should be subjected to the most stringent review, it was not so obvious, at least to some judges, what should be done with a government action attempting to remedy oppression by enacting programs or policies pursuant to what has been called "benign" discrimination. *See* Michael J. Klarman, *An Interpretive History of Modern Equal Protection,* 90 MICH. L. REV. 213, 256–57 (1991) (early equal protection analysis failed to address constitutional status of affirmative action programs); *see Fullilove v. Klutznick,* 448 U.S. 448, 492, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), *overruled, in part, Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). The Court resolved the issue, at least as it pertained to state and local governments, in *City of Richmond v. Croson,* 488 U.S. 469, 109

**2.** While earlier decisions suggested that the equal protection guarantee was especially designed to protect historically disadvantaged racial minorities, recent cases, which have held that *all* race-based discrimination is subject to strict scrutiny, appear to have modified that suggestion. *See Regents of the Univ. of Calif. v. Bakke,* 438 U.S. 265, 295, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (suggesting historical discrimination criterion may not be adequate to explain application of Equal Protection Clause).

S.Ct. 706, 102 L.Ed.2d 854 (1989), by holding that state and local remedial actions that favored one race over another would be subject to strict scrutiny, even though those actions did not disfavor a historically disadvantaged group. *Croson,* 488 U.S. at 494, 109 S.Ct. 706. However, the Court left unresolved what level of scrutiny should be applied to the actions of the federal government.

The failure to resolve that issue was understandable. What may be required of a state actor, seeking to resolve arguably limited and parochial problems, could be different from what the courts would require of a national lawmaking body. *See id.* at 490, 109 S.Ct. 706; *Fullilove,* 448 U.S. at 483, 100 S.Ct. 2758. Congress is responsive to a national electorate. Moreover, Congress exists, in part, to address the problems of the nation as a whole, in areas where the Constitution authorizes congressional action. Therefore, it seemed possible that Congress should be given broader berth in its attempts to address nationwide patterns and practices of discrimination.

In spite of these considerations, a majority of the Supreme Court, in *Adarand,* overruled *Fullilove* to the extent that the latter case endorsed a more lenient level of scrutiny for federal remedial action. *Adarand,* 515 U.S. at 202, 115 S.Ct. 2097. The Court held that the federal government's actions, like those of state governments, must be subjected to strict scrutiny when those actions seek to favor one race over another. *Id.* However, having arrived at that determination, the Court once again failed to resolve the question that has always underlain the debate.[3] *See* Patrick E. Tolan, Jr., *Government Contracting With Small Business in the Wake of the Federal Acquisition Streamlining Act, the Federal Acquisition Reform Act, and* Adarand: *Small Business as Usual?* 44 AIR FORCE L. REV. 75, 93–94 (1998) (noting "vacuum" left by Supreme Court and predicting inconsistent decisions from lower courts in wake of *Adarand*). That ques-

tion, as it is raised by Rothe, is, given that Congress is a national lawmaking body, how may it justify its remedial, race-based programs in order to maintain their legitimacy under the strictest judicial scrutiny? *See Adarand v. Pena,* 965 F.Supp. 1556, 1572 (D.Co.1997) (*Adarand II*) (noting Supreme Court's failure to define parameters of Congress's remedial powers), *vacated,* 169 F.3d 1292 (10th Cir.1999). Because the Court has not fully answered this question, lower courts attempting to do so must look to those Supreme Court opinions that might offer some guidance, most notably, *Fullilove, Croson,* and *Adarand.*

■ In *Fullilove,* the Court addressed a challenge to a federal race-conscious, remedial action and held that Congress had the authority, under the Fourteenth and Fifth amendments, to enact affirmative action programs. Writing for the plurality in that case, Chief Justice Warren Burger stated, "It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees." *Fullilove,* 448 U.S. at 483, 100 S.Ct. 2758. The Court noted that the Fourteenth Amendment granted to the federal government the authority to enforce its equal protection guarantees. *See id.* at 476, 100 S.Ct. 2758; U.S. CONST. amend. XIV, § 5. Thus, while the Fourteenth Amendment constitutes a *prohibition* on state action, it also contains a *grant* of federal power-the power to remedy prior discrimination. *See Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Because of this grant, a plurality of the Court determined that federal remedial programs were to be reviewed under the more lenient intermediate scrutiny.

However, the Court's discussion, initiated in *Fullilove,* about Congress's authority under the Fourteenth Amendment to enact remedial programs has continued in

---

3. Indeed, it is this question that makes the debate even relevant.

the Court's subsequent opinions regarding government remedial programs. The Court revived the issue, for example, in *Croson,* a case challenging a local municipality's affirmative action program. Writing for a plurality in that opinion, Justice O'Connor affirmed the Court's deference to federal programs, stating, "Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment." *Croson,* 488 U.S. at 490, 109 S.Ct. 706. Citing extensively from *Fullilove,* Justice O'Connor concluded that Congress has the authority to identify and redress the effects of societywide discrimination, even though such authority may not be exercised by state and local governments. *Id.* at 490–91, 100 S.Ct. 2758.

Congress's ability to enact remedial measures was, of course, at the heart of *Adarand,* where the Court retracted its holding in *Fullilove* and stated that congressional remedial action, like that of the states, would be subject to strict scrutiny. However, the question of how to analyze claims of federal benign discrimination was not fully resolved. Justice O'Connor, again writing for only a plurality of the Court, merely acknowledged that the Court as a whole had not yet come to terms with the question of what deference to give congressional remedial actions. However, she noted that no justice on the Court has "repudiated in this case his or her previously expressed views on the subject." *Adarand,* 515 U.S. at 231, 115 S.Ct. 2097. Because Justice O'Connor asserted that no justice's opinion on the matter had altered, a simple headcount assures this Court that a majority of the Supreme Court, including Justice O'Connor and the four dissenters in *Adarand,* would favor some standard that allowed Congress a broader brush than it would allow the states with which to design remedial measures for the purpose of addressing nation-wide discrimination. But how broad a brush?

At least three district courts have addressed this question. *See In re Sherbrooke Sodding Co.,* 17 F.Supp.2d 1026 (D.Minn.1998); *Adarand II,* 965 F.Supp. 1556; *Cortez III Serv. Corp. v. National Aeronautics & Space Admin.,* 950 F.Supp. 357 (D.D.C.1996). In *Adarand* and *Sherbrooke,* the district courts found that the government has a compelling interest in attempting to remedy the effects of prior discrimination in the awarding of government contracts.[4] *Sherbrooke,* 17 F.Supp.2d at 1034; *Adarand II,* 965 F.Supp. at 1570. However, each court also found that the program attempting to address those effects was not narrowly tailored to that purpose. *Sherbrooke,* 17 F.Supp.2d at 1037; *Adarand II,* 965 F.Supp. at 1577. While the *Cortez* court considered only whether to grant the plaintiffs a temporary restraining order, it, too, questioned whether the SBA preference scheme could be narrowly tailored. *Cortez,* 950 F.Supp. at 361.

## BURDEN OF PROOF

Initially, the parties disagree as to the placement of the burden of proof in this case. The Government argues that a party challenging a racial classification in an affirmative action program bears the ultimate burden of proving that such a classification is unconstitutional, and courts are to apply a burden-shifting paradigm like that applied in Title VII cases. Under such a paradigm, the plaintiff bears the initial burden of demonstrating that it has been adversely affected by a racial classification. When the plaintiff meets that burden, the government must then show a strong basis for believing remedial action was necessary. If the government succeeds, the burden then returns to the

---

4. *Adarand II* has since been vacated for mootness. *Adarand v. Slater,* 169 F.3d 1292 (10th Cir.1999) (*Adarand III*). This Court discusses the case only because it is one of the few decisions attempting to apply *Adarand* and only insofar as its reasoning has aided the Court in reaching its own determination.

plaintiff to prove that the plan does not meet strict scrutiny standards.

Rothe argues that post-*Adarand* cases have placed the burden on the *government* to prove that its remedial program is narrowly tailored to a compelling interest. *See In re Sherbrooke,* 17 F.Supp.2d at 1033. To support this contention, Rothe points to *Adarand,* in which the Supreme Court stated that a government actor must "justify" its use of affirmative action programs. The Government responds that a burden of justification is not equal to a burden of proof.

The arguments are intriguing; however, the question has been resolved, at least in this Circuit. The United States Court of Appeals for the Fifth Circuit has unequivocally held that the ultimate burden remains on the plaintiff in an equal protection affirmative action case. In a recent case involving race-based remedial discrimination, that court, citing *Wygant v. Jackson Board of Educ.,* 476 U.S. 267, 277–78, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), stated, "[T]he party defending the remedial measure bears the burden of *producing* evidence that the remedial measure is constitutional. The party challenging the remedial measure, of course, bears the ultimate burden of demonstrating that the racial classification is unconstitutional." *Walker v. City of Mesquite,* 169 F.3d 973, 982 (5th Cir.1999) (emphasis added).[5] The Fifth Circuit, however, has also acknowledged that, before a court can determine whether a plaintiff has met his or her burden of proof, that court must review the evidentiary support for the government's case. *See Edwards v. City of Houston,* 37 F.3d 1097, 1112–13 (5th Cir. 1994), *reversed on other grounds,* 78 F.3d 983 (5th Cir.1996) (en banc).

▪ Thus, while the burden of production on the government under strict-scrutiny review is onerous, requiring the government defendant to produce evidence that its program is narrowly tailored to a compelling interest, that requirement does not ultimately shift the burden of proving the program's constitutionality to the defendant. Rather, under controlling precedent in this Circuit, the burden remains on the plaintiff to prove, by a preponderance of the evidence, that the program is unconstitutional.[6] *See also Hopwood v. Texas,* 78 F.3d 932, 962 (5th Cir.1996); *Adarand II,* 965 F.Supp. at 1577 (while government bears burden of producing evidence that it had a strong basis in evidence to support the enactment of remedial measure, ultimate burden of proving measure unconstitutional rests on challenger). *But see Adarand II,* 965 F.Supp. at 1577 n. 13 (stating, somewhat inconsistently, that placement of burden is unclear).

## COMPELLING INTEREST/NECESSITY OF REMEDIAL ACTION

No court considering the statutory scheme that forms the basis for Rothe's claim has rejected the Government's assertion that it had a compelling purpose in establishing contract preferences for minority businesses, and this Court will not be the first to do so. Nor will the Court dwell unnecessarily on that issue, but will instead merely briefly consider the congressional findings bearing on the need for remedial action and then separately address the Benchmark Study prepared in 1998 by the Department of Commerce, which Rothe has asked the Court to strike from the summary judgment evidence.

---

5. The Government has submitted a letter brief apprizing the Court of the existence of this new opinion. Rothe has objected to the letter brief, contending that it amounts to further argument. Because the Court had already discovered *Walker* in conducting its own research, the Court will disregard the letter brief.

6. A burden of production is not equivalent to a burden of proof. *See, generally, Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries,* 512 U.S. 267, 272–76, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994).

### Congressional Findings and Evidence Supporting Remedial Action

■■■■ The Government has established to the Court's satisfaction that there is sufficient evidence to support remedial action in the form of SBA preferences and the 1207 program and that these programs were designed to address a compelling government interest. Not only does the summary judgment evidence indicate that Congress had ample reason to enact the 8(a) program, it also shows that discrimination in government contracting has continued in spite of that program's existence. *See, e.g.,* H.R.Rep. No. 468, 94th Cong. 1st Sess. 2 (1975) (only three percent of American businesses were owned by minorities, while minorities made up sixteen percent of population); Congressional Research Service, *Minority Enterprise and Public Policy,* 52–53 (June 9, 1997) (SBA's success in aiding disadvantaged firms described as "minimal"); *see also Small and Minority Business in the Decade of the 1980s,* 97th Cong., 1st Sess. 10, 33–34, 220 (1981); H.R.Rep. No. 460, 100th Cong., 1st Sess. 18 (1987). In addition, the Government has presented evidence supporting the enactment of the 1207 program. *See* 131 Cong. Rec. 17,445 (1985); 131 Cong. Rec. 21,714 (1986); *Small Disadvantaged Business Preauthorization, Hearing Before the Investigative Subcommittee of the House Committee on Armed Services,* 102d Cong., 2d Sess. 53 (1992).

■■■■ Rothe argues that, to demonstrate a compelling interest and need for remedial action, Congress must make findings of discrimination specific to the minority in question, the industry in question, and the geographic area where the contract is to be performed. The Court rejects this argument.[7] Congress may act on a nationwide basis to remedy racial discrimination:

> Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.

*Croson,* 488 U.S. at 490, 109 S.Ct. 706. *Croson* and *Adarand,* taken together, stand for the proposition that a government, in attempting to remedy past discrimination, is bound by the conditions within that government's sphere of action. Accordingly, a city government must look to the conditions unique to that city. Congress, however, may assess the condition of the nation as a whole and may respond, within the confines of the Constitution, to those conditions.

Moreover, Congress has made findings specific to Asian Americans, *see* 15 U.S.C. § 631(f)(1), and post-enactment evidence bolsters those findings.[8] *See Adarand II,* 965 F.Supp. at 1576–77 (post-enactment evidence may be considered). While Rothe has protested that the government's findings are insufficient, it has offered no evidence that Asian Americans have not been discriminated against in the award of government contracts. Instead, it has merely asserted that the achievements of David Sohn, the Korean–American who controls ICT, suggest that, if anything, Asian Americans have benefitted from numerous advantages offered to minorities in this country. Of course, this Court cannot

---

7. The unworkability of requiring findings specific to a geographic region is apparent. Rothe is a San Antonio corporation; ICT is based in Maryland. The contract under consideration is to be performed in Mississippi. Would, or should, the Department of Defense be required to show a history of discrimination against Asian Americans in each of these places? If Mississippi is to be the geographic location where a history of such discrimination must exist, how can Rothe or this Court justify that choice?

8. In reaching the determination that Congress has a compelling purpose to act to remedy discrimination in government contracting, the Court has been aided considerably by the brief and evidence offered by the amici curiae in this case. As discussed in an earlier Order, however, the Court has not relied on the statistical evidence presented by the amici.

say that Mr. Sohn's success at getting a good education and beginning a business proves that he, or other Asian Americans, have not been discriminated against. Such a holding, without evidence, would be engaging in the worst kind of assumptions and stereotypes. Moreover, the Court believes Mr. Sohn's testimony constitutes probative and effectively unchallenged evidence that he has suffered discrimination in this country.

Nor is the Court disturbed that the findings regarding Asian Americans come from the Small Business Association, a non-elected regulatory body. As the Government points out, the SBA's definitions have remained unaltered since their inception. *See United States v. Rutherford,* 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) (agency's construction is presumed to be accepted by Congress once it has been brought to Congress's attention and has not been altered). Rothe has presented no evidence to support its claim that the list of racial minorities to be preferred under the statute is either under- or over-inclusive. As the Court discusses below, there is no contention that Asian Americans do not live in the United States. Therefore, this case is not like *Croson,* where the Supreme Court noted that some of the preferred minorities were not even represented in the Richmond population. Moreover, there are findings to demonstrate discrimination against those minorities included in the federal preference scheme. Finally, the Court agrees with the Government that it cannot find the 1207 program or the SBA definitions to be under-inclusive where Rothe has not established that any excluded group should have been included.

### The Benchmark Study

In 1998, the Department of Commerce published a Benchmark Study that presents an economic analysis of the federal government's contracts with SDBs in 100 markets. *See* Benchmark Study, 63 Fed. Reg. At 35714–15. This study was conducted in response to the Supreme Court's holding in *Adarand* and attempted to review all federal affirmative action programs to assess their constitutionality.

The study looks at government contracts in various industry groups, each of which group is assigned a two-digit industry, or SIC, code. Rothe's and ICT's businesses fall within SIC Code 73. As Rothe points out, however, the two-digit codes are, for other purposes, broken down into four-digit codes, which represent more specific industry groups. Rothe and ICT, for example, fall within four-digit SIC Code 7378.

According to the study, among those businesses in SIC 73, SDBs had the ability to capture 40.2 percent of the contracting dollars in 1996, but they were awarded only 26.4 percent of those dollars. Dr. Ian Ayres, the Government's expert on this study, testified that this discrepancy represents a statistically significant underutilization of SDBs. Further, Dr. Ayres testified that the methodology relied upon by the Department of Commerce is reliable.

Rothe challenges the study on two grounds. First, Rothe notes that, because the underlying data, some of which was obtained from the Census Bureau, is not part of the summary judgment evidence, the study's reliability cannot be attested to. Second, Rothe argues that the figures offered by the Government cannot aid the Court because they are not narrow enough. In other words, Rothe contends that the Department of Commerce should have made findings for the more narrowly defined, four-digit, industry groups, rather than for the two-digit industry groups. Alternatively, Rothe argues that the Department of Commerce should have used a newly developed classification system, the North American Industry Classification System (NAICS), which, Rothe contends, would have yielded more accurate results.

The Court is aware of the problems Rothe has encountered in attempting to gain access to the data underlying the Benchmark Study. The Department of Commerce has refused to turn over that data, relying on an asserted privilege. *See* 13 U.S.C. §§ 8(b), 9(a); *Baldrige v. Shapi-*

*ro,* 455 U.S. 345, 360–62, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982) (recognizing statutory privilege protecting raw data furnished to the Census Bureau from any use other than statistical). This Court has ruled that it will not lengthen the period of discovery to accommodate Rothe's attempt to defeat that privilege. However, Rothe has had access to a summary of the underlying data. Moreover, neither the Government nor the Government's expert has been given access to the raw data. The parties are at an equal disadvantage, if they are disadvantaged at all.

■ Most important, however, the Court finds that Rothe has offered no evidence, or even a convincing argument, that there is reason to distrust the underlying data. Once the Government met its burden of production by offering credible statistics supporting an inference of discrimination, it was Rothe's burden to prove the program at issue is unconstitutional. *See Engineering Contractors Association of South Fla., Inc. v. Metropolitan Dade Co.,* 122 F.3d 895, 916 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1186, —— L.Ed.2d —— (1998). Rothe might do this by (1) showing the statistics are flawed; (2) showing that the disparities are not significant; or (3) presenting contrasting statistics. *Id.* Rothe has done none of these. Instead, Rothe argues, "Considering that the benchmark study was conducted to form the framework for race-based programs in federal procurement which could cause harm to non-minorities, it would be inappropriate to accept [the claim of privilege] unquestioningly." This is insufficient reason to question the study. The Court will not presume that any party to this litigation is conducting itself in bad faith; certainly, it will not presume, absent any evidence, that the Government is hiding data in order to further a putative desire to harm non-minorities.

Nor has Rothe persuaded the Court that the study relies on faulty methodology. The Court finds that Rothe has misapplied the case it relies upon for this argument. In *F. Buddie Contracting, Ltd. v. Cuya-*

*hoga Comm. College Dist.,* 31 F.Supp.2d 571 (D.Ohio 1998), the district court rejected a set of reports relied upon by the defendants to show evidence of discrimination. In part, the rejection was based on the testimony of the Government's expert in *this* case, Dr. Ian Ayres, who stated that the reports were based on a "crude head-counting method" that was basically unreliable. Rothe claims that Dr. Ayre's position regarding the Benchmark Study in this case is inconsistent with the position he espoused in *Buddie.*

The Court disagrees. In his deposition testimony, Dr. Ayres clearly distinguished the head-counting methodology relied upon by the Department of Commerce. Specifically, Dr. Ayres testified that the Benchmark Study controlled for variables such as firm size and therefore avoids engaging in that flawed methodology. Therefore, *Buddie* does not establish that the methodology used in the Benchmark Study is unreliable.

■ The Court is unconvinced that the Commerce Department's findings with regard to the communications industry are insufficient to support the DoD's claim that it has a basis for taking remedial action. Rothe argues that, because the findings are from a broad industry classification, business services, rather than the narrower classification of communications-computer operations and maintenance, the Government has not succeed in showing a need for remedial action. It is not this Court's province to tell Congress how, or at what level of specificity, to define the various industries with which it enters contracts. While it is clear from Rothe's summary judgment brief and evidence that the Department of Defense might have, and in fact since has, defined the industry with more specificity, the Court finds no case that stands for the proposition that the Department must have done so in order to survive strict scrutiny. *See Ritchey Produce Co. v. Ohio Dept. of Administrative Services,* 85 Ohio St.3d 194, 265, 707 N.E.2d 871, 921 (1999) (defining ideal race-remedial program is not function of

courts). Moreover, the Court finds credible the testimony of Jeffrey Mayer, director of Policy Development for the Economics and Statistical Administration and the Department of Commerce, that the classification system advocated by Rothe was not available to the Department at the time of the Benchmark Study. Rothe has not rebutted this testimony.

For these reasons, the Court will not strike the Benchmark Study.[9]

### NARROW TAILORING

The three post-*Adarand* cases that have addressed the question of whether the federal government's SBA-based remedial program was narrowly tailored to its purpose have unanimously agreed that it is not. Each of these courts held, however, that the Government had a compelling purpose in acting. The Court is troubled by the implicit suggestion in these opinions that, while the federal government may be given more deference than state and local governments in articulating a compelling purpose for remedial action, it must nonetheless be rigidly held to the standards set forth in *Croson*, a case involving the actions of a municipality, if it is to show that its action is narrowly tailored to that purpose. If Congress is to be allowed a broad vision of the nation's problems, it seems only logical that it be allowed some measure of deference in addressing those problems. In other words, there must be some relationship between the breadth of the problem to be remedied and the breadth of the remedy to be allowed. Strict application of the *Croson* criteria, without consideration of Congress's role in addressing issues that face the nation as a whole, will almost inevitably result in the invalidation of congressional remedial measures. Such automatic invalidation would render strict scrutiny "strict in theory; fatal in fact," a result that the Supreme

Court has explicitly rejected. *See Adarand*, 515 U.S. at 237, 115 S.Ct. 2097.

The most cited discussion of the showing necessary to meet the narrow tailoring prong of the strict scrutiny analysis is found in *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), a case addressing a state race-based remedial effort. In that case, the Supreme Court stated that a court subjecting a state action to strict scrutiny must consider several factors in determining whether that action was narrowly tailored to its purpose: (1) the necessity of the relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of the relief, including the inclusion of waiver provisions; (4) the relationship of stated numerical goals to the relevant labor market; and (5) the impact of the relief on the rights of third parties. *Paradise*, 480 U.S. at 171, 107 S.Ct. 1053. Post-*Adarand* decisions have applied the *Paradise* factors when determining whether *federal* remedial programs are narrowly tailored. *See Sherbrooke*, 17 F.Supp.2d at 1035; *Adarand II*, 965 F.Supp. at 1577.

██ Rothe argues that the Government's plan here fails the narrowly tailored prong under each of the *Paradise* factors. Certainly, *Adarand* tells us that even Congress may not prefer one race over another without specific findings of discrimination in the industry at question. *See Cortez*, 950 F.Supp. at 361. However, the Court does not believe that the *Paradise* factors, when applied to federal action, can, or should, be applied in lockstep conformity with *Croson*. *See Croson*, 488 U.S. at 490, 109 S.Ct. 706 (Congress may address society-wide discrimination, while state and local governments may not).

### Neutral Alternatives[10]

In *Croson*, the Supreme Court held that the City of Richmond had not considered

---

9. Nor will the Court strike portions of the Defendants' fact summary or summary judgment evidence, as requested by Rothe. The Court finds no merit to Rothe's objections to the challenged materials.

10. The Court has discussed the necessity for remedial action above.

the use of race-neutral measures to combat the effects of prior discrimination in the letting of city contracts. *Croson,* 488 U.S. at 507, 109 S.Ct. 706. The Court stated that many of the problems identified by the City in the construction industry could be addressed by programs that did not refer to race, such as the institution of a city-financing program for small firms. *Id.* at 509–10, 109 S.Ct. 706.

Rothe contends that, as in *Croson,* there is no evidence in this record that the Government has considered or employed race-neutral means of eliminating any alleged prior discrimination in government contracting. First, Rothe argues that the deposition testimony of Pat May, a specialist in the utilization of small disadvantaged businesses at Columbus Air Force Base, proves that alternatives are not being utilized. Rothe also argues that the very existence of a ten-percent preference, a five-percent goal, and a presumption favoring certain racial minorities proves that alternatives were not considered. Rothe notes that the DoD is not required to keep track of how many SDBs it utilizes or the impact of the preference on the federal government's costs. Finally, Rothe observes that, in the year in question, the DoD's goal could have been met without ever utilizing the preference. Because this is so, Rothe contends, and because the DoD has expressed no intention of discontinuing the program, the DoD has not considered alternatives to its implementation.

The Government responds with evidence of Congress's efforts to reach out to minority businesses without relying on race as a criterion for preferences. The Government notes that Congress, in 1953, passed the Small Business Act, which allowed the Small Business Administration to subcontract federal contracts to small businesses. The preference scheme at issue here, the Government contends, resulted from the failure of this program and others to aid minority businesses. *See Fullilove,* 448 U.S. at 466–67, 100 S.Ct. 2758 (discussing Congress's conclusion that race-neutral

programs and enactments aimed at ending discrimination had not been effective).

Moreover, the Government notes that the DoD has engaged in race-neutral efforts to reach minority businesses, including programs to provide information, training, and research for such businesses. In fact, the deposition testimony of Pat May, relied upon by Rothe, demonstrates that the DoD does, in fact, conduct informative programs, open to any business wishing to contract with the Government, that provide tips and guidance for competitive bidding. The 1207 program itself authorizes several approaches to reaching the five-percent goal, including technical assistance, modification of competitive procedures, advance payments, and contracting with historically minority educational institutions. 10 U.S.C. § 2323(a), (c), (e).

■■■ The Court finds that Congress has made adequate attempts at applying race-neutral criteria in an attempt to remedy past discrimination in government contracting. *See Adarand II,* 965 F.Supp. at 1583 (finding Congress's consideration of race-neutral alternatives to be sufficient). *But see Sherbrooke,* 17 F.Supp.2d at 1035 (finding that Congress's findings with regard to success of SBA were insufficient to show consideration of alternatives when passing analogous program that relied on SBA definitions). Moreover, the Court believes that deference should be given to congressional findings that discrimination has continued and must be addressed, as evidenced by the repeated renewal of the preference program at issue here.

Finally, the Court is not persuaded that the evidence that the DoD might have or would have reached its five-percent contracting goal without applying the preference is of dispositive significance. Nothing in the statutory scheme at the time it was applied in this case suggests that this goal was or should have been viewed as a "ceiling." *See Cortez,* 950 F.Supp. at 361 (noting that five-percent goal is a "minimum"). In fact, another proposal before Congress in 1985, which ultimately failed,

set *ten* percent as a contracting goal. Further, the Government's evidence suggests that the failure to end the preference when the five-percent goal was reached was based on an interpretation of the statutory scheme, not on racial animus or any other illicit motive. *See* Office of the Inspector General, *Procurements in the Telecommunications Services Resale Market,* Rep. No. 95–159, April 5, 1995 (continuation of preferences was based on interpretation of the law establishing the preference program).

The Court is not suggesting that preferences should or can be applied without regard to limits. Clearly, there must be some relationship between the stated goals and the relevant labor pool. However, Rothe has not provided evidence showing that, in this case, the number of contracts awarded with or without the preferences exceeded any constitutional limit that might be placed on Congress. On the contrary, the Government contends that the five-percent goal is considerably lower than the actual pool of "ready, willing, and able [SDB] contractors," which, according to the Government, is as high as 40.2 percent of the available contract dollars. While Rothe challenges the accuracy of that figure, it has not provided any justification for its apparent position that the Government should have been held, prior to recent statutory amendments, to its five percent goal, once it reached that goal.[11] The Court cannot find that the DoD's ability to exceed its own goals without the application of the preferences resulted in a denial of Rothe's rights.

### Flexibility and Duration

█ The Court finds the 1207 program to be both limited in duration and flexible in application. The DoD is required by statute to make annual reports to Congress on its progress toward reaching the five-percent goal. *See* 10 U.S.C. § 2323(i). According to the Government, it was in response to such reports that Congress adopted the amendment, in 1998, that suspends the program when its use becomes unnecessary to achieve that goal. It is clear, then, that mechanisms for self-adjustment exist and help to ensure the program's constitutionality.

In addition, the provision sets a "goal," not a "quota," and the preferences are available to all businesses, not just those owned by minorities. While it is true that some minorities are given a presumption of disadvantage, that presumption may be rebutted. The Court is aware that the district court in *Sherbrooke* found that the rebuttability of the presumption did not ensure its flexibility. *See Sherbrooke,* 17 F.Supp.2d at 1036–37. However, this Court finds the rationale behind this holding disturbing. In *Sherbrooke,* the court stated, "*If there are circumstances under which such preferences comport with the United States Constitution* ... they do not exist here." *Id.* at 1037 (emphasis added). That court's suggestion that a program that allows presumptions of disadvantage could *never* be constitutional seems to this Court rash and unsupported by the current state of law. Such presumptions, where challengers are allowed an opportunity to rebut, ensure flexibility without sacrificing the efficiency and manageability of the remedial program.[12] *See Cortez,* 950 F.Supp. at 361 (finding that SBA program is, on its face, narrowly tailored because it sets only a goal, contains a rebuttable presumption, and allows

---

11. As both parties have noted, a recent amendment to the provision mandates that the DoD end all preferences when it reaches its five-percent goal. *See* Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub.L. No. 105–261, § 801, 112 Stat.1920 (1998). While this amendment sheds some light on *present* congressional intent with regard to the 1207 program, it does not offer any information about Congress's intention at the time the five-percent figure was originally formulated.

12. Efficiency must be of some import in these cases. As DoD representative Tim Foreman stated in deposition testimony, the difficulties in implementing some of the *Croson* mandates on a national level would be "insurmountable."

for self-adjustment). For the same reason, the Court disagrees with the district court's conclusion in *Adarand II* that it is difficult to "envisage a race-based classification that is narrowly tailored." *Adarand II*, 965 F.Supp. at 1580. Such a statement flies in the face of the explicit language of the Supreme Court that "strict in theory" is not necessarily "fatal in fact."

Finally, the Court finds that the program, by its own terms, is limited in duration. *See* 10 U.S.C. § 2323(k) (program set to end in year 2000). Rothe contends that there is no reason to believe the program will not continue, despite the statutory end date. However, as the Government notes, the program has never been allowed to continue without being reenacted, on the basis of findings that discrimination continues in government contracting. The Court finds that the statutory end date, along with the opportunity for reexamination and annual reviews, ensure that the program is of limited duration.

### The Relationship of Stated Numerical Goals to the Relevant Labor Market

██ In *Croson*, the Court stated that the thirty-percent "quota" established by the City of Richmond for city contracts rested on the "completely unreasonable" assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population. *Croson*, 488 U.S. at 471, 109 S.Ct. 706 (quoting *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 494, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)). Rothe contends that, as in *Croson*, the Government here has failed to demonstrate that its five-percent goal is at all relevant to the pool of ready, willing, and able minority-owned businesses. The Government, on the other hand, points to the Department of Commerce's Benchmark Study, which suggests that 40.2 percent of the relevant market is comprised of minority-owned businesses.

As this Court has discussed, the Benchmark Study is sufficient to meet the government's burden of production in this case. The burden of proving the program unconstitutional remains on Rothe. The Court agrees with Rothe that the 40.2–percent figure does not necessarily establish the pool of ready, willing, and able SDBs in the relevant industry. As Rothe points out, the 40.2–percent figure represents the pool of SDBs available in contracts classified under Standard Industrial Classification (SIC) 73, or "business services." *See Phillips & Jordan, Inc. v. Watts*, 13 F.Supp.2d 1308, 1315 (N.D.Fla. 1998) (suggesting that two-digit SIC codes were insufficiently narrow to show discrimination in particular industry). However, the Court notes that the summary judgment evidence establishes conclusively that the actual pool of SDBs has exceed five percent, the goal set by the DoD. This is so because, as Rothe has argued, the DoD has met or *exceeded* this goal several times. Moreover, Rothe has presented no evidence that the five-percent goal is disproportionate to the pool of ready, willing, and able SDBs in Rothe's industry group.

Finally, the Government notes that Dr. Ayres has acknowledged that the figure arrived at in the study may not be perfectly accurate. However, according to Ayres, the methodology used to arrive at the figure was credible and the overall results are valid and conservative. THE Court does not believe, in the absence of any evidence showing otherwise, that the statistical evidence should be rejected.

### Random Inclusion

In *Croson*, the Supreme Court rejected the City of Richmond's affirmative action program in part because the Court found that the program favored racial minorities for whom no history of discrimination had been established. *Croson*, 488 U.S. at 505–506, 109 S.Ct. 706. In fact, the City could not prove that some of the minorities were even represented in the Richmond population. *Id.* This "random inclusion" of minorities, the Court stated, helped demonstrate that the challenged program was not enacted for a compelling purpose or narrowly tailored to combat past discrimi-

nation. *Id.* Rothe contends that the same kind of "random inclusion" has occurred here. The Court rejects that claim.

■ Obviously, Congress must have a basis for acting to remedy discrimination, and, obviously, its acts must be aimed at that discrimination. However, as discussed previously, the Court does not believe that *Croson's* mandate that a *local* government make specific findings regarding specific minorities in specific industries can or should be applied, without alteration, to the acts of Congress. *See Adarand II,* 965 F.Supp. at 1572 (finding that federal government is not required to make particularized findings of discrimination in particular industry in particular state); *Cortez,* 950 F.Supp. at 361 (while congressional acts receive strict scrutiny, they are entitled to greater deference than state governments). The evidence offered by the Government and by amici curiae demonstrates that the minorities preferred in this program reside in the United States and have been discriminated against in the procurement of government contracts. The Court finds this showing sufficient.

### Burden on Third Parties

It is undeniable that the Government's application of the 1207 program in this case placed a burden on Rothe: Rothe lost a contract it had previously held. The Government has admitted that the loss was based on the application of 1207. Thus, Rothe's point—that it has been harmed by the program—must be conceded.

■ However, proof of such harm is not sufficient to prove that the program is unconstitutional. Rather, Rothe must prove that it suffered harm that is intolerable under the Fifth Amendment to the United States Constitution. *See Fullilove,* 448 U.S. at 484, 100 S.Ct. 2758 ("[I]t is not a constitutional defect [that the challenged program] may disappoint the expectations of minority firms"); *Ritchey,* 707 N.E.2d at 922 (race remedial program are not required to benefit all state citizenry). If the Court were to grant Rothe's position—

that the mere loss of the contract constitutes a violation of the Equal Protection Clause—no race-based remedial program would survive strict scrutiny. The Court believes that such a result contravenes the clear language of *Adarand.* Race-based remedial action is intended to address an unfair burden that has been born by a disadvantaged minority, and Congress, a body of elected public servants, has determined that American society (including "innocent" third parties) as a whole must bear at least some burden in effecting a remedy. *See Ritchey,* 707 N.E.2d at 925 (no unfair burden where burden was widely disbursed, minimal, and an "incidental consequence" of the remedial program).

In *Sherbrooke,* the Court found that the plaintiffs had shown a *disproportionate* amount of the burden for the government's preference program fell on them and on small subcontractors like themselves. *See Sherbrooke,* 17 F.Supp.2d at 1036. The Court there noted that the work at issue was less "capital-intensive" than other similar work, and, thus, that loss of such work *unfairly* burdened those non-capital-intensive subcontractors who where white and male. Accordingly, the Court found, "The burden [was] not broadly shared." *Id.*

The 1207 program, by its own terms, is prohibited from placing an *unfair* burden on non-SDBs. 10 U.S.C. § 2323(g). Monitoring is required to ensure that this does not occur. Rothe has not demonstrated that monitoring has not been effective. In fact, Rothe has shown no more than that it lost a contract it desired. Rothe has not demonstrated that this loss was unfair or that it has been asked to bear an unfair proportion of a burden that the task of remedying past discrimination asks all of society to bear. The Court, therefore, will not hold that this 1207 program, as applied here, places an unfair burden on third parties such as Rothe.

### CONCLUSION

The Court agrees with the Ohio Supreme Court's reasoning in *Ritchey Pro-*

**954**

*duce Co. v. Ohio,* a decision upholding a state preference for minority businesses. In that opinion, the Court, quoting from *Adarand,* stated:

The rationale for requiring judicial scrutiny of all governmental racial classifications, we are told, is as follows:

Absent searching judicial inquiry into the justification for such racebased measures, there is simply no way of knowing what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple race politics. Indeed, the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

The classification [here] was clearly not motivated by illegitimate notions of racial inferiority, illegitimate racial prejudices, or stereotype, or "simple racial politics." Thus, if the purpose of strict scrutiny really is to smoke out any such illegitimate motivations for a government racial classification, we are absolutely convinced that, when all the smoke has cleared, no such illegitimate motivations may be attributed to Ohio's General Assembly.

*Ritchey,* 707 N.E.2d at 925 (citation omitted).

■ In this case, too, the Court finds that a thorough examination of the statutory scheme at issue and its application to the contract at issue reveals no illegitimate purpose, no racial prejudice, and no racial stereotyping. Rather, the program is designed to address a societal ill that has been identified by Congress on the basis of extensive evidence, and the program is narrowly tailored to that purpose.

ACCORDINGLY, it is ORDERED that the Government's motion for summary judgment (Docket No. 51) is GRANTED, and Rothe's motion for summary judgment (Docket No. 50) is DENIED. It is further ORDERED that:

1. Rothe's motion to strike the GOVERNMENT's summary judgment evidence (Docket 53) is DENIED;

2. Rothe's motion to strike the Benchmark Study relied upon by the Government (Docket No. 66) is DENIED; and

3. Rothe's motion to strike the Government's letter brief is GRANTED (Docket No. 71).