Donald SERETSE–KHAMA, Petitioner,

v.

John D. ASHCROFT, Attorney General; James Ziglar, INS Commissioner; David Venturella, Director, Headquarters Post–Order Detention Unit; and Warren A. Lewis, INS District Director, Respondents.

No. Civ.A. 020955JDB.

United States District Court, District of Columbia.

July 22, 2002.

Paul Virtue, E. Desmond Hogan, Lynne Baum Hogan & Hartson, L.L.P., Washington, DC, for Petitioner.

Wyneva Johnson, United States Attorney's Office, Judiciary Center, Washington, DC, for Respondents.

## MEMORANDUM OPINION

BATES, District Judge.

Before the Court is petitioner Donald Seretse–Khama's motion for a preliminary injunction seeking his release from the custody of the Immigration and Naturalization Service ("INS") pending either resolution of his petition for a writ of habeas corpus or his removal to Liberia. Petitioner is a detained alien subject to removal from the United States. This case raises a serious issue relating to the application of the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), in light of the fact that petitioner has been detained pending removal since August 3, 1998. In consideration of the parties' briefs and oral argument, the INS records regarding petitioner, and the entire record, the Court grants petitioner's motion and orders his release pending either his removal to Liberia or an adverse decision on his habeas corpus petition.

## I. *Procedural Posture and Jurisdiction*

To begin with, however, a threshold issue must be addressed. The government has taken this Court and petitioner on a very troubling procedural ride, changing its position on a critical issue at the eleventh hour. The issue is whether respondents have waived the right to assert a lack of personal jurisdiction over respondent Warren Lewis, the District Director of the INS for the Washington, D.C. region, including Virginia.

On May 16, 2002, petitioner filed this habeas petition and his motion for a preliminary injunction. The Court promptly scheduled a hearing on the preliminary injunction for June 24, 2002, and set a briefing schedule, to which petitioner agreed when respondents pledged not to transfer petitioner prior to July 15. Respondents filed a response to the habeas petition on June 12, 2002, titled "Respondents' Opposition to Petitioner's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241" (hereinafter "Opposition"), in which they contended that petitioner's detention was lawful and that his removal was imminent. Petitioner then filed a reply (styled a "traverse") on June 17, 2002.[1] Then on June 20, 2002—eight days after filing their opposition to the habeas petition—respondents filed a "Motion to Dismiss Petitioner's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 or in the alternative to Transfer" (hereinafter "Motion to Dismiss"). In this second filing, respondents argued for the first time that this Court did not have personal jurisdiction over Edward L. Crosley, the superintendent of the Central Virginia Regional Jail in Orange, Virginia, where petitioner is detained.[2] Respondents moved to dismiss the petition under Rule 12(b)(2) for lack of personal jurisdiction over Crosley, claiming that although he has not been sued, he is the only proper respondent because he is the true custodian of petitioner.

Subsequently, at the June 24th hearing, respondents reversed their position again, this time asserting that Crosley is not the proper respondent and custodian after all, but rather that Warren Lewis, the INS District Director, is. Respondents contend that the Court lacks personal jurisdiction over Lewis because his office is in Arlington, Virginia, and his actions with respect to petitioner all occurred in the Western District of Virginia. Petitioner opposed the motion to dismiss as untimely and waived under Fed.R.Civ.P. 12(h)(1), but respondents countered that they could amend their initial opposition to the habeas petition pursuant to Fed.R.Civ.P. 15(a) to reflect this latest defense of lack of personal jurisdiction. The parties filed supplemental briefs on the issue at the Court's direction.

 The Court finds that respondents waived the right to challenge personal jurisdiction over respondent Lewis in this case.[3] Rule 12(h)(1) states in relevant part

---

1. Respondents never filed a separate opposition to the motion for a preliminary injunction, but appear to have incorporated that opposition into their opposition to the petition for a writ of habeas corpus.

2. The jail is located in the Western District of Virginia.

3. Even assuming that respondents did not waive personal jurisdiction, petitioner has argued that the Court nonetheless has personal jurisdiction over Lewis because his office is in charge of immigration matters in Virginia *and* Washington, D.C., and because he has conducted business in the District of Columbia as the District Director of the INS. The Court will not address that issue because it finds that respondents have waived the personal jurisdiction defense with respect to respondent Lewis. In light of that conclusion, the Court also need not address at this time whether the other three named respondents are proper respondents in this case.

that "[a] defense of lack of jurisdiction over the person ... is waived (A) if omitted from a motion in the circumstances described in subdivision (g)." In turn, Rule 12(g) states in relevant part that "[i]f a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted."[4] Reading Rules 12(h)(1) and 12(g) in tandem, the defense of lack of personal jurisdiction over respondent Lewis is waived. On June 20, 2002, respondents filed a motion to dismiss asserting that there was no personal jurisdiction over Crosley. But respondents did not raise, and thus "omitted," the defense that the Court did not have personal jurisdiction over respondent Lewis. Rule 12(g) unequivocally states that respondents cannot make a second motion—whether written or oral—to raise the omitted defense of lack of personal jurisdiction over Lewis.[5] *See, e.g., Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 909 (5th Cir.1993); *O'Brien v. R.J. O'Brien & Assoc., Inc.*, 998 F.2d 1394, 1398–1400 (7th Cir.1993); *Lederman v. United States*, 131 F.Supp.2d 46, 58 (D.D.C.2001), *remanded on other grounds*, 291 F.3d 36 (D.C.Cir.2002); *Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd.*, 985 F.Supp. 640, 642–643 (E.D.Va.1997).

The Court therefore concludes that respondents waived the defense of lack of personal jurisdiction over respondent Lewis.[6] The Federal Rules of Civil Procedure, which respondents concede govern the issue,[7] do not countenance the maneuvering in which respondents have engaged.[8]

---

4. A defense of lack of jurisdiction over the person may be raised by motion under Rule 12(b)(2).

5. Because Crosley was not named as a respondent, the first motion could also be viewed as made under Rules 12(b)(6) or 12(b)(7) rather than under Rule 12(b)(2). That would not change the result here, since that first motion still was made under Rule 12 and omitted the defense of lack of personal jurisdiction over Lewis.

6. Respondents cannot amend their initial Opposition pursuant to Fed.R.Civ.P. 15(a) to include the defense of lack of personal jurisdiction over Lewis. Respondents arguably had the right under Rule 15(a) to amend their first pleading—their Opposition filed on June 12—to include the defense of lack of personal jurisdiction over Crosley, viewing the Opposition as, in effect, the equivalent of an answer to a civil complaint, to which no responsive pleading is permitted. Because this case was not on the Court's trial calendar, and because no responsive pleading to the Opposition was permitted, under Rule 15(a) respondents had 20 days to amend that Opposition as a matter of course to raise their defense of lack of personal jurisdiction over Crosley, in which case there would be no waiver of that defense. Rule 15(a), however, allows amendment only *"once* as a matter of course," and thus respondents cannot amend their initial Opposition a *second* time by raising lack of jurisdiction over Lewis *without leave of Court or* written consent. Permitting such a second amendment would circumvent the clear directive of Rules 12(g) and 12(h)(1) that failure to raise the defense of personal jurisdiction in the first motion under Rule 12 results in a waiver.

7. *See* Respondent's Supplemental Memorandum at pp. 1–2; *see also* 28 U.S.C. § 2242; Fed.R.Civ.P. 81(a)(2); *United States v. Hicks*, 283 F.3d 380, 383–84 (D.C.Cir.2002) (applying Fed.R.Civ.P. 15 in habeas action).

8. Indeed, the advisory committee notes to Rule 12 underscore that the rule was designed to prevent the kind of piecemeal litigation at issue here:

This required consolidation of defenses and objections in a Rule 12 motion is salutary in that it works against piecemeal consideration of a case.... A party who by motion invites the court to pass upon a threshold defense should bring forward all the specified defenses he then has and thus allow the court to do a reasonably complete job. The waiver [under subdivision (h)(1)(A) ] reinforces the policy of subdivision (g) forbidding successive motions.

Fed.R.Civ.P. 12 (advisory committee note).

Hence, the Court will proceed to the merits of petitioner's claim notwithstanding that, if not waived by respondents, there may be a genuine question whether this action against respondent Lewis, as custodian of petitioner, should proceed in this Court.

## II. *Factual Background*

Petitioner was born in the Republic of Liberia on November 20, 1972, came to the United States with his family when he was eight years old, and has lived here continuously since then. Resp.Ex. 1. His mother is Liberian and his father is from Sierra Leone. Pet.Ex. A, Declaration of Seretse–Khama at ¶ 3. On August 21, 1990, he became a permanent lawful resident of the United States. On October 21, 1993, the Circuit Court of Alexandria, Virginia, convicted him of possession with intent to distribute cocaine, and sentenced him to eight years in prison on January 27, 1994. *Id.* at ¶ 8; *see also* Resp.Ex. 2. Before his incarceration, petitioner resided in northern Virginia and his sister, stepmother and stepbrothers currently live in northern Virginia. *Id.* at ¶¶ 9, 16.

Given his conviction of an aggravated felony, the INS initiated removal proceedings to deport petitioner pursuant to Section 237(a)(2)(A)(iii) and Section 237(a)(2)(B)(i) of the Immigration and Nationality Act ("INA" or "the Act"). Resp. Ex. 3. After an early release from his criminal sentence, the Virginia Department of Corrections transferred petitioner to the custody of the INS on August 3, 1998, where he was held without bond. One month later, on September 3, 1998, an Immigration Judge ordered petitioner deported to Liberia. Resp.Ex. 8. He did not appeal that order, which thus became administratively final on October 5, 1998. *Id.* Meanwhile, on September 30, 1998, the INS requested that the Liberian Embassy issue travel documents. Resp.Ex. 9. As a result, Abdulah K. Dunbar, the First Secretary and Consul of the Republic of Liberia Embassy, conducted a short interview of petitioner on October 10, 1998, concerning his knowledge and ties to Liberia. Resp.Ex. 10. Petitioner truthfully answered Dunbar's questions, and correctly stated the capital of Liberia and the president's name. Seretse–Khama Dec. ¶ 12. However, petitioner was unable to name the hospital or county where he was born, as he has not had any contact with his mother since he left Liberia at the age of eight. *Id.* at 12, ¶ 5. He also stated that he did not have any family in Liberia. *Id.*[9]

More than three months after his interview, the Liberian Consulate still had not issued travel documents. On January 26, 1999, INS Deportation Officer Ashly Ocasio requested assistance from INS headquarters in obtaining the travel documents, but this request went unanswered. Resp.Ex. 10. On May 11, 1999, as mandated by its regulations, the INS conducted the first (of eventually five) Post–Order Custody Review of petitioner. Resp.Ex. 11. As a result, Officer Ocasio recommended petitioner's release from INS custody, stating that petitioner would not pose a threat to the community if released from INS custody and citing his "simple" charge of possession of cocaine with intent to distribute. *Id.* at p. 5. The Supervisory Detention Officer did not concur with Officer Ocasio's parole release recommendation, and petitioner remained in the custody of INS. *Id.* at p. 6.

---

9. Although petitioner has had no contact with his mother in 20 years, "the last [he] heard, she was living somewhere in Africa, though not in Liberia." Seretse–Khama Dec. ¶ 5. He and his sister currently have no contact with their father, who is now married to an American, and petitioner has never been to Sierra Leone. *Id.* at ¶ 3.

Custody reviews were also conducted on July 30, 1999, November 15, 2000, June 25, 2001, and June 1, 2002. In the report of the July 30, 1999, custody review, under "Can a Travel Document be Obtained," Officer Ocasio checked the box "No." Resp.Ex. 12, at p. 1. She stated:

I have spoken with the detainee on numerous occasions. I have concluded that he literally has no family in Liberia. The Liberia Embassy does not want to send back. Unfortunately, without the endorsement of the Liberia Embassy, getting a document is impossible....

*Id.* at 4. Again, Officer Ocasio recommended release, and this time the Supervisory Detention and Deportation Officer concurred with her recommendation, and the final custody determination was to release petitioner under an order of supervision. *Id.* at 5. There is nothing in the record explaining why petitioner remained detained and was not released at that time.

However, nearly three months following this recommendation of release, petitioner assaulted a jail employee and destroyed property on September 29, 1999. Resp. Ex. 13. He was charged with attempted injury of correctional facility staff and destruction of property. *Id.* On February 11, 2000, he pled guilty to the charges, and received a two-year sentence with one year and six months suspended, for an effective sentence of only six months. Resp.Ex. 13 and Ex. 14.[10]

On November 16, 2000, Officer Ocasio conducted a telephonic interview of petitioner for another custody review. For the third time, Officer Ocasio recommended release, under supervision with $12,000 bond. Resp.Ex. 22. Her report stated:

The Liberian Consulate verified that the subject is Liberian, however, will not issue a travel document.... The Embassy is of the belief that the subject really has no ties to Liberia. He came to the U.S. as a child and does not speak the language. The Embassy is of the opinion that the subject will become a public charge because there is absolutely no family in Liberia.

*Id.* at p. 1.[11] Similarly, in a custody review conducted on June 25, 2001, the INS again noted that travel documents would not be issued: "The Liberian Consulate verified that subject is from Liberia but they will not issue document because subject has no ties in Liberia and will become a public charge if returned." Resp.Ex. 26, at p. 1. Petitioner's detention thus continued.

By late June 2001, therefore, petitioner had been detained by the INS awaiting deportation for almost three years following his transfer to INS custody on August 3, 1998. Even excluding his six-month sentence for his prison assault offense, by that point he had been detained by the INS for almost two and one-half years, the last ten months of which followed his assault sentence. On June 28, 2001, the United States Supreme Court announced its ruling in *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The Court held that the Attorney General could not indefinitely detain lawfully admitted, but subsequently ordered removed, aliens during the post-removal period (i.e., the time after a 90–day statutory removal period) while they awaited deportation. Instead, the Court limited

---

**10.** Petitioner was transferred from INS custody on April 4, 2000, and released to the United States Marshal's Service to serve his sentence. Resp.Ex. 17. On September 9, 2000, he was returned to INS custody after serving the sentence. *Id.*

**11.** The Supervisory Detention and Deportation Officer, however, disagreed with the recommendation and petitioner continued in custody. *Id.* at p. 5.

detention to no more than a presumptive "reasonable time" of six months, unless the government can establish that there is a "significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701, 121 S.Ct. 2491.

Several months after the decision in *Zadvydas*, the INS again continued petitioner's detention on October 11, 2001. Resp.Ex.· 27. Without explanation, that decision informed him that "[t]he INS is pending receipt of your travel document and you will be removed in the reasonably foreseeable future." *Id.* However, the receipt of travel documents was not "pending." Instead, on December 10, 2001, Neil Acvi, a Supervisory Deportation Officer for INS, wrote a letter to the Consulate General of the Republic of Liberia seeking travel documents for petitioner. Resp.Ex. 28. "This letter," he wrote, "constitutes a third written request for issuance of a travel document for Donald Seretse–Khama." *Id.* The letter stated:

> On August 14, 2001, the [INS] left a message regarding the status of issuing a travel document. Your office did not return our call. Mr. Dunbar, the consulate at the time, interviewed Mr. Seretse–Khama on two occasions. Mr. Dunbar explained that he could not issue a travel document for two reasons. The first is that Mr. Seretse–Khama stated that he did not want to be deported and that he did not have family in Liberia. As of this date, no travel document has been issued. It is now incumbent upon the [INS] to carry out this deportation order.

*Id.*

On May 16, 2002, petitioner filed his petition for writ of habeas corpus under 28 U.S.C. § 2241, along with a motion for a preliminary injunction and a temporary restraining order. Two weeks later, on June 1, 2002, the INS conducted another custody review of petitioner. *See* Resp.Ex. 29

and 30. Officer Ocasio, whose previous reviews all recommended petitioner's release, conducted this custody review as well. This time, however, she recommended his continued custody, stating that petitioner "has not made an attempt to find an alternate country to be removed to. In addition, he still remains positioned on not returning to Liberia." Resp.Ex. 29, at p. 5. Officer Ocasio further explained:

> [T]he Service needs to vigorously pursue the issuance of a travel document and seek more assistance from HQ. The last attempt was approximately 8 months ago. Several major issues concerning foreign nationals has arisen over the last eight months and I believe that the Service (HQ) will be successful in obtaining a travel document.... Based on the subject's behavior while in Service custody and the belief that a document is still obtainable with the assistance of HQ, it is my recommendation that he remain in custody.

*Id.* Consequently, the INS sent petitioner a letter stating its decision not to release him:

> The [INS] submitted a request to the Embassy of Liberia on September 30, 1998 for the issuance of a travel document. As a result of this request, you were interviewed on two different occasions. The [INS] submitted a new request December 10, 2001. After both interviews and the most recent request, the consulate informed the [INS] that you are in fact a citizen of Liberia. However, they were not willing to issue a travel document because you told the consulate that you did not want to go back to Liberia. By this action, you have actively worked to prevent your own departure from the United States. Under Section 241(a)(1)(C) of the Immigration and Nationality Act, you are required to timely make an application, on

your own, for a travel document and *to not act to prevent your removal.* [Your] statements to the consulate violate this section. Therefore, your removal period under 241(a)(1)(A) is extended until you are in compliance.

Resp.Ex. 30, at p. 1 (emphasis in original). The letter added that "in the Service's experience, it is likely that a Liberian national may be removed to that country," noting that 47 persons had been deported back to Liberia in 2001 and the first quarter of 2002, with 45 deported in 2000, 38 in 1999, 49 in 1998, and 45 in 1997. "You have not provided any evidence that your case is an exception," the letter concluded. *Id.*

Hence, petitioner continues to be detained almost four years after his transfer to INS custody on August 3, 1998, which is over 22 months since his return to INS custody in September 2000 (after service of his six-month sentence for an assault offense while in detention) and well over a year after the Supreme Court's decision in *Zadvydas.* For the first time, in a custody review conducted after petitioner filed this action, the INS now bases his continued detention on a purported active effort by petitioner to prevent his removal to Liberia.

## III. *Standard for Preliminary Injunction*

■ In order to prevail on his motion, petitioner must demonstrate (1) a substantial likelihood of success on the merits; (2) that he will suffer irreparable harm absent the relief requested; (3) that respondents will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief.

*Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1505–06 (D.C.Cir.1995); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir. 1977). In determining whether to grant urgent relief, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* It is particularly important for plaintiffs to demonstrate a substantial likelihood of success on the merits. *Morgan Stanley DW Inc. v. Rothe,* 150 F.Supp.2d 67, 73 (D.D.C.2001).[12] Here, petitioner has demonstrated a substantial likelihood of success on the merits of his petition for a writ of habeas corpus, and has satisfied the other elements for injunctive relief as well.

## IV. *The Immigration and Nationality Act*

The Immigration and Nationality Act specifies in detail the procedures for deporting certain aliens to their countries of origin. Once it has been determined that an alien should be deported, the INS has 90 days to effectuate "removal," and this 90–day removal period typically begins when the removal order becomes administratively final. 8 U.S.C. § 1231(a)(1)(A), (B)(i). The INS will consult with the consulate or embassy of the alien's home country to determine if they will accept the alien, and if so, to obtain the necessary travel documents. When a removal order becomes final, the Attorney General is re-

---

**12.** Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *See Morgan Stanley DW,* 150 F.Supp.2d at 73. "As the Supreme Court has said, '[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Id.* (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).

quired to detain the alien in custody during the subsequent 90–day removal period. 8 U.S.C. § 1231(a)(2).[13]

If the government cannot remove the alien within this initial 90–day period, the Attorney General "may" detain the alien beyond that period. 8 U.S.C. § 1231(a)(6). INS regulations require that the District Director review the alien's records after the 90–day removal period to decide whether further detention or release under supervision is warranted. *See* 8 C.F.R. § 241.4(c)(1), (h), (k)(*l*)(i). If the decision is to detain the alien further, an INS panel will conduct a custody review within three months or soon thereafter. 8 C.F.R. § 241.4(k)(2)(ii). This panel determines, on the basis of records and possibly an interview, whether to detain the alien further or release him under supervision. 8 C.F.R. § 241.4(i)(1). In making this determination, the panel considers, for example, the alien's disciplinary record, criminal record, mental health reports, rehabilitation, history of flight, and favorable factors such as family ties. 8 C.F.R. § 241.4(f). In order to authorize the alien's release, the panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release. 8 C.F.R. § 241.4(e). If the panel decides against release, it must review the case again within a year. 8 C.F.R. § 241.4(k)(2)(iii), (v).

### V. *The Zadvydas Decision*

Petitioner claims that under the Supreme Court's ruling in *Zadvydas v. Davis* the INS must release him at this time unless it can demonstrate that there is a significant likelihood of his removal—i.e., that travel documents are about to be obtained—in the reasonably foreseeable future. Petitioner is certainly correct that *Zadvydas* governs his petition for writ of habeas corpus. Handed down on June 28, 2001, the decision established a presumptive limit of six months on the Attorney General's authority to detain aliens pending removal once removal orders become final and the 90–day statutory removal period runs. *See* 533 U.S. at 701, 121 S.Ct. 2491.

The Supreme Court found that Congress did not intend to permit indefinite detention awaiting removal, because such a construction would raise serious constitutional problems:

> [W]e read an implicit limitation into the statute before us. In our view, the statute, read in light of the Constitution's demands, limits an alien's post-removal period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention.

*Id.* at 689, 121 S.Ct. 2491. As a result, the Court established a six-month presumptive period of detention:

> After this 6–month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-

---

**13.** Once the removal order is final, the Act authorizes the INS to detain certain aliens, including inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for national security or foreign relations reasons. *See* 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.4(a). Because petitioner was convicted of possession with intent to distribute cocaine, a felony for which he was sentenced to eight years in prison, the INS had the right to remove him to Liberia, his home country. *See* 8 U.S.C. § 1227(a)(2)(A)(i)(II) (alien convicted of a felony with a sentence of a year or more may be deported); 8 U.S.C. § 1227(a)(2)(B)(i) (alien convicted of distributing controlled substance may be deported).

removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.

*Id.* at 701, 121 S.Ct. 2491. In the case of a detained alien seeking habeas relief, the Court stated:

> [T]he habeas court must ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute. In that case, of course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions. And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period.

*Id.* at 699–700, 121 S.Ct. 2491 (citations omitted).

Thus, if a federal court determines in a habeas action that removal is not "reasonably foreseeable," the alien should be released from custody subject to conditions of supervised release that are "appropriate in the circumstances." *Id.* at 700, 121 S.Ct. 2491. Under the Supreme Court's guidance in *Zadvydas,* this Court must determine whether petitioner has provided a sound basis to believe there is no "significant likelihood" that the INS will remove him in the "reasonably foreseeable future," and, if so, whether respondents have rebutted that showing. *Id.* at 701, 121 S.Ct. 2491.

## VI. *Discussion*

### A. Petitioner's Showing

An immigration judge ordered petitioner's removal on September 3, 1998, and that order became administratively final on October 4, 1998. The statutory 90–day removal period therefore ended in early January 1999. The period of 42 months since then during which petitioner has been detained is roughly seven times the six-month period that the Supreme Court has established as presumptively reasonable for removing an alien. Certainly, the INS has had more than enough time to obtain travel documents and secure petitioner's removal.

The INS actively attempted to secure petitioner's removal at the outset of his detention. First, the INS requested travel documents from the Liberian Embassy on September 30, 1998. As a result, the Liberian Counsel interviewed petitioner on October 10, 1998. Pet.Ex. A. When travel documents still had not been issued, on January 26, 1999, INS Detention Officer Ocasio requested assistance from INS headquarters in obtaining the necessary travel documents, but that request went unanswered.

Four custody reviews over the ensuing three years indicate that there is little chance the INS will obtain the necessary travel documents. On May 11, 1999—over seven months after the removal order and the interview with the Liberian Embassy—the INS conducted a custody review and stated:

> As of this date no [travel] doc issued. Consulate has informed me that Liberian authorities can not verify his birth. Until birth can be verified, no doc can be issued. Spoke with Consulate Dunbar on 6/14/99. It was established that he is Liberian (probably.) However the detainee states (to the consulate) that he

does not want to go back to Liberia. It is my feeling that the Consulate does not want to issue doc.... It is my conclusion that Mr. Dunbar has established that he is Liberian however because Mr. Seretse tells him he does not want to return, Mr. Dunbar is less inclined to issue. I finally asked Mr. Dunbar would he issue a doc, he says yes, but he wants to finalize his check of Mr. Seretse's background..... The problem is that we will not be issued a document for the detainee. They cannot verify his birth and therefore no document can be issued. The Embassy admits that he is Liberian but need to verify birth and approve deportation. Neither of which is done. I recommend release.... 6/15/99 spoke w/ Mr. Seretse–Khama in person. He states he does not want to go back to Liberia. That he was a child when he left Liberia. Does not speak the language or have any family there.

Resp.Ex. 11, p. 4–5. Officer Ocasio conducted a second custody review on July 30, 1999, and she reiterated the Embassy's concern for his lack of ties to the country:

I have concluded that he has literally no family in Liberia. The Liberian Embassy does not want to send back. Unfortunately, without the endorsement of the Liberia Embassy, getting a document is impossible. The reason this subject does not have a travel document is due to the Embassy not wanting to issue the document. He has no family ties. The Liberia government is concerned.

Resp.Ex. 12, p. 4. Officer Ocasio again recommended release, and the Supervisory Detention and Deportation Officer concurred. *Id.* at p. 5. Petitioner was not released then, however. In a November 12, 2000, custody review, following petitioner's conviction and sentence for assault

while in detention, Officer Ocasio again recommended release:

On 9/30/1998, a travel document request was presented to the Embassy of Liberia. On 10/03/1998, the subject was interviewed by the Consulate. On 1/25/1999, a request for assistance was forwarded to HQDDP. HQDDP was unable to provide any assistance. The Liberian Consulate verified that the subject is Liberian, however, will not issue a travel document. There are several factors governing their decision not to issue a travel document. The Embassy is of the belief that the subject really has no ties to Liberia. He came to the U.S. as a child and does not speak the language. The Embassy is of the opinion that the subject will become a public charge because there is absolutely no family in Liberia.

Resp.Ex. 22, p. 1. "The subject," she noted, "has been in Service Custody for almost two years." *Id.* at p. 4. A fourth custody review on June 25, 2001, repeated that there was little hope of obtaining travel documents for petitioner:

HQDDP unable to assist. The Liberian Consulate verified that subject is from Liberia but they will not issue document because subject has no ties to Liberia and will become a public charge if returned.

Resp.Ex. 26, p. 1.

By the time the Supreme Court announced its ruling in *Zadvydas* on June 28, 2001, then, petitioner had already been detained by the INS for over 30 months after the statutory 90–day removal period—far longer than the six-month period the Supreme Court held was presumptively reasonable.[14] On October 11, 2001, five months after the *Zadvydas* ruling, the INS

---

**14.** This was approximately ten months after petitioner was returned to INS custody following his sentence for an assault charge.

notified petitioner, in what appears to be a form letter, that his detention was continued, and that the "INS is pending receipt of your travel document and you will be removed in the reasonably foreseeable future." Resp.Ex. 27 at p. 1. Yet, at the time of that letter, it is apparent from INS records that "receipt" of any travel documents was far from "pending." Indeed, even two months later, the INS was still struggling to get the Liberian Embassy to return its calls. On December 10, 2001, Neil Acvi, a Supervisory Deportation Officer for INS, wrote a letter to the Consulate General of the Republic of Liberia, again requesting travel documents:

> On August 14, 2001, the Service left a message regarding the status of issuing a travel document. Your office did not return our call. Mr. Dunbar, the consulate at the time, interviewed Mr. Seretse–Khama on two occasions. Mr. Dunbar explained that he could not issue a travel document for two reasons. The first is that Mr. Seretse–Khama stated that he did not want to be deported and that he did not have family in Liberia. As of this date, no travel document has been issued. It is now incumbent upon the [INS] to carry out this deportation order.

Resp.Ex. 28. The INS assertion in October 2001 that it was "pending receipt" of travel documents from the Embassy was simply, and blatantly, false. Indeed, it has now been nine months since the INS sent that letter, and still no travel documents have been received.

After more than three and one-half years of detention—and nearly a year after the ruling in *Zadvydas* —petitioner sought relief from this Court to force his release. The INS hurried to conduct a custody review two weeks later on June 1, 2002. Officer Ocasio noted:

> On 9/30/1998 a [travel document] request was presented to the Embassy and the subject was interviewed by the Consulate on 10/05/1998. . . . Another attempt was made to obtain a travel document on 12/10/2001. . . . As of the date of this review, HQ has not been able to assist with obtaining a travel document.

Resp.Ex. 29, at p. 2. Thus, more than three years transpired between INS's attempts to obtain travel documents on September 30, 1998, and again on December 10, 2001. It is only in this most recent custody review that the INS has belatedly concluded that petitioner's detention should continue because he has failed affirmatively to cooperate in his removal to Liberia.

Based on this record of the continued detention of petitioner awaiting removal for well over three years (far in excess of the six-month presumptively reasonable period), with no success by the INS (and arguably little effort) in obtaining travel documents, the Court concludes that petitioner has met his burden of showing "good reason to believe that there is no *significant likelihood* of removal in the reasonably foreseeable future." *Zadvydas,* 533 U.S. at 701, 121 S.Ct. 2491 (emphasis added). Indeed, there is still no sign of travel documents on the horizon since the INS communication with Liberian officials in December 2001—some eight months ago. Under the sliding scale adopted in *Zadvydas,* the lengthy period of petitioner's post-removal confinement has certainly caused the "reasonably foreseeable future" to shrink to the point that removal must be truly imminent; the record as presented by petitioner provides more than an adequate basis to believe that is not the case here.

### B. The INS Response

Respondents have two arguments in response to petitioner. On the one hand, they contend that there is ample evidence to rebut petitioner's showing that there is

no significant likelihood of his removal to Liberia in the reasonably foreseeable future. In addition, however, respondents now contend that petitioner's failure to cooperate independently justifies his continued detention. The Court addresses these positions in turn.

### 1. *The INS Rebuttal Evidence*

"[O]nce the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas,* 533 U.S. at 701, 121 S.Ct. 2491. Here, respondents fall woefully short.[15] The applicable INS regulation lists a number of factors the INS must consider to determine whether there is a significant likelihood of removing a detained alien in the reasonably foreseeable future:

> Factors for consideration. The HQPDU shall consider all the facts of the case, including, but not limited to, the history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of

those efforts, the views of the Department of State regarding the prospects for removal of aliens to the country, and the receiving country's willingness to accept the alien into its territory.

8 C.F.R. § 241.13(f). However, the only evidence respondents offer to carry their burden is an arguable indication of past success in removing aliens to Liberia.[16] Respondents maintain that efforts to obtain a travel document for petitioner cannot be presumed "futile," as the INS puts it, "particularly since Liberia has repatriated a number of its citizens in recent years." Resp.Opp. at 15. Of course, to believe that future efforts to obtain travel documents from Liberia will be anything other than futile is to ignore the abject failure of the INS to obtain travel documents over the past four years, the repeated observations of INS officials that travel documents could not be obtained, and Liberia's consistent unwillingness to issue travel documents to petitioner. Moreover, this Court must determine whether there is evidence of a significant likelihood of removal in the reasonably foreseeable future, *see Zadvydas,* 533 U.S. at 701, 121 S.Ct. 2491, not whether the INS efforts will be futile.

Here, respondents' statistics may actually cut *against* their argument that removal will occur in the reasonably foreseeable

---

**15.** Respondents argue that "it would be premature to conclude that there is no significant likelihood that Mr. Seretse–Khama's removal can be accomplished in the reasonably foreseeable future." Resp.Opp. at 14. The contention that resolution of the key issue here is "premature" is somewhat astounding. Petitioner's detention is far overdue for consideration—after all, the INS has had more than three and one-half years to remove him. It is unclear just how much more "mature" an alien's detention pending removal would need to be for the INS to feel the issue is ripe for resolution.

**16.** According to respondents, past removal efforts to Liberia have been successful, and the

Court should infer from that success that petitioner's removal is likewise sure to occur:

> [I]n fact, in the Service's experience, it is likely that a Liberian national may be removed to that country. In Fiscal Year (FY) 2001 and the first quarter of FY 2002, 47 persons were removed to Liberia. For Fiscal Years 1997, 1998, 1999 and 2000, 45, 49, 38 and 45 persons were removed to Liberia respectively. You have not provided any evidence that your case is an exception.

Resp.Opp. at 14–15 (*quoting* Resp.Ex. 30, Decision to Continue Detention, p. 1).

future. If the government is able to remove this number of Liberians annually, it may underscore the problems the INS has had attempting to remove petitioner. On the other hand, respondents' figures are ultimately of little real force unless one knows how many attempted removals to Liberia were made each year. Finally, while "the history of the Service's efforts to remove aliens to the country in question" is one consideration to take into account in determining the likelihood of removal in the foreseeable future, this factor becomes increasingly less important the longer a country refuses to provide travel documents for a particular removable alien. That is the case here. The fact that the INS has been successful in repatriating over two hundred other Liberians over the past five years reinforces the view that Liberia does not want to take petitioner back at all, since over that same span of time Liberia has consistently refused to accept petitioner.

Hence, these numbers, if they suggest anything, more likely suggest that Liberia does not want petitioner back now or anytime in the near future. Indeed, "the receiving country's willingness to accept the alien into its territory" is one of the enumerated factors for considering whether there is a significant likelihood of removal in the reasonably foreseeable future—and the INS custody reviews state unequivocally that Liberia does not want to take petitioner back because of his lack of family and ties in Liberia. The regulations also state that "the Service's efforts to remove this alien" should be considered. The Court finds that the efforts of the INS

have been belated at best, and for long periods totally non-existent. In the year since the Supreme Court's decision in *Zadvydas* and establishment of a six-month presumptively reasonable detention period, the INS has made only the faintest efforts to seek petitioner's removal, despite the fact that he has already been in INS detention for close to four years. Simply put, the INS's efforts have been lax, and in no way support the contention that petitioner's removal is significantly likely in the reasonably foreseeable future.[17]

Respondents have not demonstrated to this Court that any travel documents are in hand, nor have they provided any evidence, or even assurances from the Liberian government, that travel documents will be issued in a matter of days or weeks or even months. *See, e.g., Okwilagwe v. INS*, No. 3–01–CV–1416–BD, 2002 WL 356758, *2–3 (N.D.Tex. Mar. 1, 2002) (alien detained for eleven months after INS represented that it would have travel documents in a few days; court found that if INS did not have documents in hand, it failed to sustain its burden of showing that alien's removal would occur in the reasonably foreseeable future); *Lewis v. INS*, Case No. 00CV0758(SJ), 2002 WL 1150158 (E.D.N.Y. May 7, 2002) (if INS could not remove alien who had been detained for 23 months within 30 days, alien would be released). Moreover, the record of past experience is to the contrary, as there has consistently been no sign of the issuance of travel documents. Consequently, the Court concludes that the INS has not demonstrated that petitioner will be removed

---

**17.** The INS also cites Officer Ocasio's June 2, 2002 custody review report where she states that she "believe[s] that the Service(HQ) will be successful in obtaining a travel document." Resp.Opp. at p. 15; *see also* Resp.Ex. 29. But that assertion is nothing more than a generic, unsupported representation, and was made three weeks after petitioner filed this action. Indeed, the Court cannot find such a representation reliable, particularly after the INS falsely assured petitioner in a letter over nine months ago that it was "pending receipt of your travel document, and you will be removed in the reasonably foreseeable future."

to Liberia very shortly—which is respondents' burden under the sliding scale in *Zadvydas* in light of petitioner's already lengthy detention awaiting removal. His release, therefore, is mandated by *Zadvydas,* and petitioner has demonstrated a substantial likelihood of success on the merits of his habeas petition.

### 2. *Failure to Cooperate*

Respondents now also contend that petitioner has not cooperated in obtaining travel documents because he told Liberian officials that he did not want to return to Liberia. On that basis, it is argued, his continued detention is warranted because the period to remove an alien under the INA "shall be extended ... if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal." 8 U.S.C. § 1231(a)(1)(C). There is no dispute that petitioner stated during his interview with the Liberian Consul that he did not want to return to Liberia. The INS now uses his statement as a basis for denying his release on the grounds that he has hindered his removal by stating he did not want to return to Liberia. *See* Resp. Ex. 29, p. 2.

It is important to recognize what the INS is *not* claiming. Respondents do not argue that petitioner refused to request

travel documents or refused to be interviewed by Liberian officials. There is also no claim that he ever denied his Liberian citizenship, or gave false or misleading information that impeded the issuance of travel documents. In fact, he willingly agreed to an interview with the Liberian Consul within days of his removal order becoming administratively final. Furthermore, he truthfully answered the Consul's questions, admitted that he was born in Liberia, and even correctly answered questions about the country. However, he also honestly told the Consul that he did not want to return to Liberia in light of his lack of family in or ties to Liberia, which he left in 1980 when he was only eight years old.

■ Respondents cite no case law to support their view that petitioner's truthful (and somewhat self-evident) statement constitutes a lack of cooperation or failure to assist in his removal under 8 U.S.C. § 1231(a)(1)(C). The limited case law construing what constitutes an affirmative act that prevents one's return does not support the proposition that an alien's statement of a lack of desire to return to his country of origin, without more, amounts to a bad faith failure to cooperate.[18]

More importantly, there is little in the record to indicate that Liberia refuses to issue travel documents for petitioner sim-

---

**18.** Furthermore, most of the case law was decided before the Court's ruling in *Zadvydas. See, e.g., Bini v. Aljets,* 2002 WL 535083, 36 Fed.Appx. 868 (8th Cir.2002) (alien who obtained stay of proceedings in district court prevented his removal); *Powell v. Ashcroft,* 194 F.Supp.2d 209, 210–211 (E.D.N.Y.2002) (alien who claimed in four affidavits that he was from U.S. Virgin Islands, Jamaica, Trinidad, and Canada, and provided false name and false date of entry, prevented his removal); *Riley v. Greene,* 149 F.Supp.2d 1256, 1262 (D.Colo.2001) (alien who admitted he refused to complete travel arrangements and refused to name any country for deportation);

*Sango–Dema v. District Director,* 122 F.Supp.2d 213, 221 (D.Mass.2000) (alien who refused to provide passport and birth certificate, and refused to communicate with embassy officials or complete application for documents); *Ncube v. INS,* 1998 WL 842349, *16 (S.D.N.Y. Dec. 2, 1998) (failing to provide INS with passport or proof of identification or nationality; many statements false or at least contradictory); *cf. Ford v. Quarantillo,* 142 F.Supp.2d 585, 588 (D.N.J.2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin).

ply because he does not want to return to the country. In fact, the custody review reports suggest quite clearly that Liberia does not want to issue travel documents because it is concerned about accepting an alien who has no ties to the country, and who would likely become a ward of the state. *See, e.g.,* Resp.Exs. 12 p. 4, 22 p. 1, 26 p. 1. That would be true, of course, whether or not petitioner wanted to return to Liberia. The only time over four years that the INS determined that the statement that petitioner did not want to return to Liberia amounted to a failure to cooperate in obtaining travel documents was *after* this action was filed, more than three and a half years after he had made the statement to the Liberian Consul during his interview in October 1998, and following several custody reviews.

The first reference to petitioner's statement that he did not want to return to Liberia appears in the custody review report for May 11, 1999:

> Consulate has informed me that Liberian authorities can not verify his birth. Until birth can be verified, no doc can be issued. Spoke w/ Consulate Dunbar on 6/14/99. It was established that he is Liberian (probably.) However the detainee states (to the consulate) that he does not want to go back to Liberia. It is my feeling that the Consulate does not want to issue doc.... It is my conclusion that Mr. Dunbar has established that he is Liberian however because Mr. Seretse tells him he does not want to return, Mr. Dunbar is less inclined to issue. I finally asked Mr. Dunbar would he issue a doc, he says yes, but he wants to finalize his check of Mr. Seretse's background.

Resp.Ex. 11, p. 4. Notwithstanding petitioner's statement that did not want to return to Liberia, then, it is clear that the Embassy agreed that it would issue a travel document. This custody review report is the *only reference,* in four custody reviews, to this statement until the petition for a writ of habeas corpus was filed.

After the second custody review on July 30, 1999, Officer Ocasio again explained the reason why the Embassy did not want to provide travel documents:

> I have concluded that he literally has no family in Liberia. The Liberia Embassy does not want to send back. Unfortunately, without the endorsement of the Liberia Embassy, getting a document is impossible. The reason this subject does not have a travel document is due to the Embassy of Liberia not wanting to issue the document. He has no family ties. The Liberia government is concerned.

Resp.Ex. 12, at p. 4. There is no mention of any concern about the lack of interest in returning, only repeated references to the lack of "family" or "family ties" in Liberia. Similarly, in the custody review report of November 15, 2000, the sole reason noted for the refusal to issue travel documents is the Embassy's concern over the lack of ties to Liberia:

> There are several factors governing their decision not to issue a travel document. The Embassy is of the belief that the subject really has no ties to Liberia. He came to the U.S. as a child and does not speak the language. The Embassy is of the opinion that the subject will become a public charge because there is absolutely no family in Liberia.

Resp.Ex. 22, p. 1. Again, there is no mention of petitioner's statement that he did not want to return to Liberia. And in the June 25, 2001, custody review report, the INS confirmed that:

> The Liberian Consulate verified that subject is from Liberia but they will not issue document because subject has no

ties to Liberia and will become a public charge if returned.

Resp.Ex. 26, at p. 1.

It is only *after* petitioner sought relief in federal court that the INS developed an additional reason for refusal to issue travel documents based on his statement that he did not want to return, as expressed in the June 2, 2002, custody review:

> A request for assistance was sent to HQ on 01/26/1999. The consulate at the time had no doubt that the subject was Liberian, however stated that he would not issue a travel document for two reasons. The first reason being that the subject has no family in Liberia, thus would make him a public charge to the Liberian government. The consulate explained that there were enough people being supported by the government already. The second reason the consulate gave for not issuing a travel document was because the subject told him that he did not want to return to Liberia. The subject explained to the Consulate that he did not know the language, had no family in Liberia and that it would be difficult for him to provide for himself in Liberia. . . . The consulate's position and the subject's position on the issue of deportation have not changed since the first and second interviews. . . . I believe the subject has hindered his deportation by telling the consulate that he does not want to return and will not return to Liberia.

Resp.Ex. 29, at p. 2. This purported reason does not appear in the earlier custody reviews. Indeed, although the INS claims that the Embassy cited this purported reason back on January 26, 1999, the INS only focuses on it three and one-half years later. In other words, although the three preceding custody reviews occurred without any mention that petitioner's statement has held up the issuance of travel documents, just two weeks after this habeas petition was filed the INS has suddenly concluded that petitioner "hindered his deportation by telling the consulate that he does not want to return." [19]

The recent assertion of this additional explanation for petitioner's detention pending removal is not credible. Moreover, as discussed above, petitioner's simple and honest explanation that he did not want to return to a country to which he had no ties, without any accompanying affirmative lack of cooperation, is not a refusal to cooperate that supports an extension of detention. The Court therefore finds that under these circumstances petitioner's continued detention is not warranted under section 1231(a)(1)(C).

### C. *Balance of Harms*

Having found a strong likelihood that petitioner will succeed on the merits of his claim, the Court must also assess the relative harms at issue. Under the facts of this case, the balance of harms strongly favors petitioner's release.

First, the harm to petitioner if he is not released is immeasurably significant. The deprivation of one's physical liberty for almost four years and continuing into the future is an undeniably substantial and irreparable harm.[20] As the Supreme Court noted in *Zadvydas*, "if removal is

---

**19.** Indeed, under the regulations passed following the ruling in *Zadvydas*, the INS must inform and "serve notice" to an alien of his failure to comply with regulations requiring his assistance and cooperation, and it must do this "before the expiration of the removal period." 8 C.F.R. § 241.4(g)(1)(ii). This regulation was apparently designed to prevent what clearly has happened here: an alien's indefinite detention for more than three years, without any notice of the reason he is being detained or what he could do to resolve any problems with his deportation.

**20.** *See, e.g., Jolly v. Cloughlin,* 76 F.3d 468, 482 (2nd Cir.1996) (unconstitutional confinement raises presumption of irreparable harm); *United States v. Bogle,* 855 F.2d 707, 710–711 (11th Cir.1988) ("unnecessary deprivation of liberty clearly constitutes irreparable

not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." 533 U.S. at 699, 121 S.Ct. 2491. Moreover, there is minimal harm to the respondents if petitioner is released under appropriate conditions. The "basic purpose" of the statute is "assuring the alien's presence at the moment of removal." *Id.* Here, there is little harm threatened by the release of petitioner, largely because his release will be conditioned on INS supervision and the posting of a bond. *See id.* at 700, 121 S.Ct. 2491 ("[O]f course, the alien's release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and the alien may no doubt be returned to custody upon a violation of those conditions."). Finally, the public interest is served by petitioner's release, because the alternative—continued indefinite detention—poses serious constitutional risks. *Id.* at 682, 121 S.Ct. 2491 ("indefinite detention of aliens ... would raise serious constitutional concerns."). Again, as the Supreme Court explained, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Id.* at 690, 121 S.Ct. 2491. In light of the INS's unduly prolonged detention of petitioner, and absent any showing that petitioner presents a clear risk of flight or threat to the safety to the community, there is little doubt that the public interest would be better served here by protecting the petitioner's liberty interest. *See, e.g., Cortez III Service Corp. v. National Aeronautics & Space Administration,* 950 F.Supp. 357, 363 (D.D.C.1996) (public interest best served in upholding the Constitution).

### VII. *Conclusion*

Petitioner has established that there is a substantial likelihood that he will prevail on the merits of his petition for writ of habeas corpus. Respondents have not demonstrated that petitioner's removal is significantly likely in the reasonably foreseeable future. Nor does respondents' unconvincing (and belated) reliance on a claim that petitioner has failed to cooperate provide an independent basis for his continued detention. After more than 46 months in INS detention awaiting removal, any further detention pending removal will cause needless and irreparable harm to petitioner. On the other hand, neither respondents nor the public will be harmed by the release of petitioner, as the Court will order appropriate supervision and conditions to ensure his presence at removal. Indeed, it is noteworthy that the INS itself previously recommended petitioner's release pending removal in its July 30, 1999, custody review.

Accordingly, petitioner's motion for a preliminary injunction will be granted, and petitioner is ordered released. The Court will, however, first require respondents promptly to identify the conditions of release they believe are appropriate to impose under the circumstances. A separate order accompanies this Memorandum Opinion.

harm"); *Wanatee v. Ault,* 120 F.Supp.2d 784, 789 (N.D.Iowa 2000) ("unconstitutional incarceration generally constitutes irreparable harm to the person in such custody"); *Securities and Exchange Commission v. Bankers Alliance Corp.,* 1995 WL 317586, *6 (D.D.C.1995) ("As for the question of irreparable harm in the absence of a stay, clearly Mr. Lee will be harmed by being incarcerated."); *Cobb v. Green,* 574 F.Supp. 256, 262 (W.D.Mich.1983) ("There is no adequate remedy at law for a deprivation of one's physical liberty. Thus the Court finds the harm asserted by plaintiff is substantial and irreparable.").